FILED

2005 Mar-25  PM 12:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DERRICK THOMAS, TIM AVERY** | ] | |
| **KEDRIC HOOKS, ROBERT SMITH,** | ] | |
| **and ROBERT VASSER,** | ] | |
| | ] | |
| **PLAINTIFFS,** | ] | |
| | ] | |
| **v.** | ] | **Case No.  CV-02-VEH-0565-S** |
| | ] | |
| **HEALTHSOUTH CORPORATION** | ] | |
| | ] | |
| **DEFENDANT.** | ] | |

**MEMORANDUM OF DECISION**

This Court has before it the August 4, 2003, motion of Defendant HealthSouth Corporation for summary judgment as to Plaintiff Tim Avery's claims.  (Doc. 23)

**I.  Procedural History**

Plaintiffs Tim Avery, Derrick Thomas, Robert Vasser, Robert Smith, and Kedric Hooks commenced this action on March 4, 2002, by filing a complaint in this Court alleging separate and individual  violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981.[1]  On August 1, 2002, Plaintiffs filed a Motion to Amend Complaint which was granted on August 5, 2002.  Plaintiff Avery contends that, throughout his employment, Defendant subjected him to both a racially hostile work environment and disparate pay race discrimination by paying him less than similarly situated white employees.  Plaintiff also alleges in his complaint that he was denied promotions

---

[1] The claims of Plaintiff Kedric Hooks (deceased) were dismissed by this Court on April 17, 2003.  The claims of the three other remaining Plaintiffs (Vasser, Thomas, and Smith) are the subject of separate pending summary judgment motions filed contemporaneously with the summary judgment motion regarding Plaintiff Avery.

and such positions were usually given to less senior and less qualified white employees, constituting disparate treatment race discrimination in promotions.   In addition, Plaintiff contends that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and retaliation; however, no corrective action was taken by the Defendant and he was further subjected to retaliation.  The Plaintiff asserts that the Defendant has a pattern and practice of race discrimination.

On August 4, 2003, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff has failed to make a prima facie case of disparate pay race discrimination, race discrimination in promotions, and retaliation;  (2) that even if Plaintiff has established a prima facie case as to  his discrimination and retaliation claims, Plaintiff has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions; (3) that Plaintiff has failed to establish the essential elements of a racially hostile work environment claim by providing evidence that he was subjected to severe or pervasive racial harassment that altered the terms or conditions of his employment; and (4) that Plaintiff has failed to establish by substantial evidence  a pattern or practice of race discrimination claim.

The Defendant has submitted evidence[2]  in support of its motion for summary judgment and filed a supporting brief on August 4, 2003.  On September 5, 2003, the Plaintiff filed a brief in response to the Defendant's motion for summary judgment.  The Plaintiff did not file evidence in opposition to Defendant's motion for summary judgment.  The Defendant filed

_____

[2] The Defendant submitted the depositions of Plaintiff Robert Vasser, Plaintiff Timothy Avery, Plaintiff Robert Smith, Plaintiff Derrick Thomas, Tricia Ealy, Mike McKee, a declaration by Tricia Ealy, and a declaration by Mike McKee.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number or the deposition exhibit being referenced.

a reply brief on September 26, 2003.

## II. Standard of Review

## A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out

to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[3]

Tim Avery, the Plaintiff, began working at HealthSouth in May, 1998, as a mail clerk in the mailroom, making $8.25 per hour.  (Avery Dep. p. 45, 56).  The primary function of the mailroom was to receive, sort, and distribute each day's mail throughout the corporate office.  (Avery Dep. p. 57-58).  Before working at HealthSouth, he worked at Kinko's for five years as a copy clerk (making copies for customers) and as a courier.  (Avery Dep. p. 35-36).  Prior to Kinko's, he worked as a data entry clerk.  (Avery Dep. p. 37).

On his July, 1999, performance evaluation, Avery received an overall score of "3" out of a possible "4,". (Avery Dep., Defendant's Exhibit 4).  In October, 1999, Avery received a raise from $8.25 to $8.54.  (Ealy Dep. Pltf's Exhibit 3).  A few months later, in December, 1999, he was promoted from mailroom clerk to lead clerk in the mailroom.  (Avery Dep. p. 61).  This promotion resulted in a $1.33 raise to $9. 87 an hour.  Id.  While he was lead clerk, Avery's pay rate was $1.50 to $2.00 higher than any other mail clerk.  (Ealy Dep. Pltf's Exhibit 3).

As lead mailroom clerk, Avery was over Robert Vasser and Erwin Williams, two black mailroom clerks.  (Avery Dep. p. 69, 83).  On one occasion in February, 2000, when Avery was

---

[3] Facts are undisputed unless otherwise expressly noted.

pushing Vasser and Williams to finish the mail, he became frustrated with their work effort and muttered "mother fucker!" (Avery Dep. p. 69-70). Vasser and Williams then became angry, started calling him "bitch" and "whore" and began coming towards him. Id. At that point, Avery had to call his supervisor Brad Jones to get control of the situation. Id.

Brent Mozley, another supervisor, came to the mailroom and discussed the incident with Avery and the others involved. (Avery Dep. p. 73-74). Vasser complained to Mozley that Avery had directed profanity towards his employees. (Avery Dep. p. 74). Avery admitted that he said "mother fucker" but said it was out of frustration with the fact that Vasser and Williams were not doing their job. (Avery Dep. p. 76). Mozley instructed everyone to get back to work and complete the job. (Avery Dep. p. 76-77). He also stressed to Avery that, as lead clerk, he should never have used such language towards other employees. (Avery Dep. p. 77).

Avery concedes that, as a result of the altercation with Vasser and Williams, there was a great deal of tension between Avery and the other employees in the mailroom. (Avery Dep. p. 79). In fact, Avery told Brad Jones that he did not feel comfortable with the other employees in the mailroom because of these tensions. (Avery Dep. p. 79-80). Further, Avery's supervisors determined that he did not have the interpersonal skills to supervise other employees. (McKee Dep. p. 94-95). As a result of these problems and concerns, Avery was given the option of working as a courier or working in the distribution center. (Id.; Avery Dep. p. 81). Avery chose the latter and was transferred to a distribution center clerk position in late February or early March, 2000. (Avery Dep. p. 78-79).[4] He was replaced as lead clerk in the mailroom by Tavarus

---

[4] The distribution center is a shipping and receiving operation, which is responsible for warehousing and shipping printed materials, marketing materials (*i.e.*, baseball caps, shirts, pens and the like) and other materials to outlying HealthSouth facilities around the country. (Avery Dep., p. 60).

Melton, a black male.  (Avery Dep. p. 65-67).

Although Avery no longer performed as a lead clerk following his transfer to the distribution center, he did not receive any cut in pay and remained at his $9.87 pay.  (Avery Dep. p. 65).  When Avery transferred to the distribution center in later February or early March, 2000, there were three other distribution center clerks - Adam Metros, Jeff Muir, and Jim McCravy. At the time of Avery's transfer Metros's pay rate was $8.28 per hour, Muir's pay rate was $7.76 per hour and McCravy's pay rate was $10.00 per hour.  (Tricia Ealy Dep. Exhibit 3).  According to HealthSouth records, McCravy was hired on December 27, 1999, as a mailroom and inventory clerk at a rate of $10.00 per hour; Craig Metros was hired on August 12, 1998, as a mailroom and inventory clerk at a rate of $8.00 per hour; and Jeff Muir was hired on April 13, 1999, as a mailroom and inventory clerk at a rate of $7.50 per hour.  (Tricia Ealy Dep. Exhibit 3).  Following Avery's July, 2000, overall performance evaluation of "3," Avery received a pay increase to $10.17 in October, 2000.  (Avery Dep. p. 62).

Avery's overall performance evaluation of July, 2001, was again a level "3" but his attendance problems had worsened to the point that "attendance for entire evaluation period had been unacceptable"and Avery had "regularly been late to work."  (Avery Dep. Defendant's Exhibit 7).  That evaluation also noted that Avery overused his vacation and personal holiday hours, which resulted in a negative balance.  Id.  Despite these problems in October, 2001, he received another merit increase to $10.51.  (Ealy Dep. Plaintiff's Exhibit 3).

While his February, 2002, evaluation was again an overall score of "3," Avery's attendance remained a problem and he was informed that he "needs to improve his time and daily attendance record for the next period."  (Avery Dep. Defendant's Exhibit 8).  He also received

7

an overall score of "3" on his July, 2002, evaluation which noted that while his attendance had improved somewhat, continued improvement was needed.  Id.  In October, 2002, Avery's pay increased to $10.88, which is his current pay rate.  (Avery Dep. p. 62-63; Ealy Dep. Plaintiff's Exhibit 3).

**Promotions/Job Openings**

On March 7, 2000, Jim McCravy was moved into the position of shipping and receiving for the print shop.  (Avery Dep. p. 96-98).  This move took place when David Dover was fired. (Avery Dep. p. 98).  HealthSouth's record show that David Dover was terminated from the shipping and receiving position in the print shop on March 8, 2000, a fact that HealthSouth cannot refute.  (Ealy Dep. Exhibit 3).  Also according to HealthSouth and Avery, McCravy's position was a special position which involved the shipping and receiving of print shop materials. (Avery Dep. p. 96-97; McKee on Dec. ¶12).  Prior to working in Dover's position in the print shop, McCravy was classified as mailroom and inventory clerk in materials management/purchasing.  (Ealy Dep. Exhibit 3).

Sid Crocker, a white male, was given the position of warehouse supervisor in November, 2001.  (Avery Dep. p. 119-127; Ealy Dep. Exhibit 3).  Avery was familiar with the warehouse and how it operated.  (Avery Dep. p. 127).  Avery had also worked in a warehouse job with Bell South.  (Avery Dep. p. 127-128).

In 2002, Avery was interested in a pre-press position.  (Avery Dep. p. 110).  This position was filled by Kerry Roberson, a white male.  (Avery Dep. p. 110-111; Ealy Dep. Exhibit 3). Another white employee, Fielding Martin, was placed into the position of mailroom lead person. (Avery Dep. p. 112).  Martin is now over the whole mailroom.  (Avery Dep. p. 112).  Avery had

previously worked in this position (or a similar position) and was interested in moving back to this position. (Avery Dep. p. 114-115).

**Avery's Complaints to Human Resources**

On May 1, 2001, Avery (along with Plaintiff Robert Smith) met with Tricia Ealy, Director of Human Resources. (Avery Dep. p. 137-138). On that occasion, Avery raised three complaints: (1) the distribution center had been split up into two sides and some people were given an easier workload because of favoritism; (2) Brent Mozley (distribution center supervisor) talked to other employees more than he did Avery; and (3) lack of training on the distribution center billing system. (Avery Dep. p. 138-139; 158-159). Both Avery and Ealy agreed that they would raise and review these issues with Mozley but Avery later decided that he would rather that Ealy talk to Mozley about his complaints. (Avery Dep. p. 159-166). Ealy talked to Mozley on May 10, 2001, and informed him of Avery's complaints, and after their conversation, Mozley told Ealy that he would meet with Avery to discuss his concerns. (Ealy Dep. p. 25-26). On the following day, May 11, 2001, Ealy spoke to Mike McKee (Mozley's superior) and suggested that he also participate in the discussion with Ealy. (Ealy Dep. Plaintiff's Exhibit 1).

Mozley and McKee met with Avery a few days later and discussed the issues he had previously raised with Ealy. (Avery Dep., p. 160; McKee Dec. ¶ 25). As to the assignments in the warehouse, Avery would neither give names of the people to whom Mozley had shown favoritism; nor would he give examples of the favoritism. (McKee Dec. ¶ 25; Avery Dep., p. 160-161; Bates 01757-01758). When asked if Mozley had ever split up the department into two sides or if he had ever told Avery that he could not work on a particular side, Avery conceded that he had not. (Avery Dep., p. 175-176).

As to Avery's complaints about being trained on billing, Plaintiff testified in his deposition that he had not been trained on billing. (Avery Dep., p. 164-165). He subsequently testified that he did not indicate to McKee and Mozley during the meeting that he had not been trained. (Avery Dep., p. 171). It was explained to Avery that one reason that he had not been assinged to billing was because of his ongoing attendance problems. (Avery Dep., p. 172). Mozley told him that he had checked the records and that between December 18, 2000, and May 7, 2001, Avery had been late to work over 50 days, had been 1-1.5 hours late over 25 days, left early several days, been out several days, overused his vacation time and personal days, and had a negative balance of 24 hours of vacation time. (Avery Dep., p. 172-173). Mozley further explained to Avery that billing had to be maintained daily and that the Company had to have a person with a dependable attendance record in that position. (Avery Dep., p. 172).

Mozley also talked to Avery about his complaint that Mozley did not speak to him as much as Mozley spoke to other people. (Avery Dep., p. 173). Mozley then cited several examples fo non-work related personal conversations that he had with Avery such as discussing Avery's wedding, his purchase of a house, and the car Avery had been working on. (Avery Dep., p. 173-174). Avery complained that Mozley had not had a conversation of a personal nature with Avery in three days. (Avery Dep., p. 174). Avery concedes that, at the close of the meeting with Mozley and McKee, all of his complaints had been addressed and explained. (Avery Dep., p. 176).

### IV. Applicable Substantive Law and Analysis

Plaintiff claims  race-based discrimination in compensation, and promotions, racially hostile work environment, pattern and practice of race discrimination, and retaliation under Title

VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[5]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is

---

[5]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

"[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990). Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Plaintiff has presented only circumstantial evidence of racial discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs, 106 F.3d at 1527. Under the McDonnell Douglas and Burdine framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. See id. at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation. See, e.g., Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984); Lincoln v. Board of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise

12

similarly situated employees outside the plaintiff's class were treated dissimilarly.[6]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has created the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[7]  See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[8]  Where the defendant articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its

---

[6]See also McDonnell Douglas, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

[7]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

[8]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment motion either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[9] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-

---

[9]The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

<u>Hicks</u> case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 920-21 (11th Cir. 1993).

## A. <u>Discrimination in Compensation</u>

Defendant argues that it is entitled to summary judgment as to Plaintiff's disparate pay race discrimination claim because (1) Plaintiff cannot provide evidence of a similarly situated employee; (2) Plaintiff has failed to establish a prima facie case of disparate pay race discrimination; and (3) Plaintiff has failed to demonstrate pretext and rebut the Defendant's legitimate nondiscriminatory reasons for the salary of the alleged comparator. Plaintiff claims that, throughout his employment, Defendant paid him less than similarly situated white employees, constituting disparate pay race discrimination. The Court finds that Plaintiff has not established a prima facie case of race-based discrimination in compensation and summary judgment should be granted in favor of the Defendant as to this claim.

Adapting the <u>McDonnell Douglas</u> test to the facts of this case, an employee must establish a prima facie case of intentional discrimination in compensation under Title VII by showing that (1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage. <u>See</u> <u>Cooper, et. al., v. Southern Company, et. al.</u>, 390 F.3d 695, 735 (11th Cir. 2004) (compensation discrimination by race); <u>Daniel v. Church's Chicken</u>, 942 F.Supp. 533, 538 (S.D. Ala 1996); <u>Miranda v. B&B Cash Grocery Store, Inc</u>, 975 F.2d 1518, 1528 (11th Cir. 1992) (compensation discrimination by gender); <u>MacPherson v. Univ. of Montevallo</u>, 922 F.2d 766, 774 (11th Cir. 1991) (compensation discrimination by age). The comparators must perform jobs similar to the Plaintiff's; thus,

the Plaintiff must show that, in his job, he "shared the same type of tasks" as the comparators. Cooper, et. al., v. Southern Company, et. al., 390 F.3d 695, 735 (11th Cir. 2004), quoting Miranda, 975 F.2d at 1529.

The Defendant argues that Plaintiff cannot establish a prima facie case because he fails to show the existence of a similarly situated employee. Plaintiff alleges that he was paid less than Jim McCravy who performed substantially the same job as him. The Plaintiff asserts that McCravy shipped and received materials for the print shop and Plaintiff shipped and received materials in the distribution center. The Defendant asserts that McCravy's position is not substantially similar to Plaintiff's position. The Eleventh Circuit has noted in dicta that "in a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." Cooper, 390 F.3d at 735 (quoting MacPherson, 922 F.2d at 774 n.16)

Plaintiff is a black male. Plaintiff  was initially employed as a mail and inventory clerk in the mailroom; he later transferred to the distribution center. Plaintiff's position in the distribution center required him to fill orders for either human resources or marketing materials. McCravy, a white male, was a mail and inventory clerk in the distribution center who was solely  responsible for the shipping and receiving of printed materials for the print shop. It is undisputed that McCravy received a higher wage than the Plaintiff. The Plaintiff acknowledged that there is a "special job where someone did the printing shipping." (Avery Dep., p. 95). The Defendant provided evidence that McCravy was  responsible for the shipping and receiving of printed materials for the print shop. (McKee Dec.¶ 12). Plaintiff

16

further confirmed that McCravy's job also required him to do any computer entries, billing or invoicing that went with shipping printing materials. (Avery Dep., p. 96-97).  In contrast, Plaintiff admitted that he and other distribution clerks handled only the shipping of non-print shop materials.  (Avery Dep., p. 97).  Although both positions entail the receipt and delivery of preprinted materials to outlying HealthSouth facilities, the two positions are distinct.

Even assuming, however that the Court finds that McCravy's position and Plaintiff's position are similarly situated and Plaintiff has shown a prima facie case of disparate pay discrimination, Plaintiff has not demonstrated that the Defendant's proffered legitimate nondiscriminatory reason is a pretext for discrimination. The Defendant has proffered that McCravy's significant prior work experience warranted paying him a higher salary than Plaintiff.   McCravy had approximately 19 years of experience, all of which was in the shipping of printed materials at EBSCO, National Computer Print, Mail Enterprises, High Cotton, and other businesses.  A factor such as experience is a legitimate non-discriminatory reason and is often used as a defense to liability in sex-based wage discrimination claims. See Miranda, 975 F.2d at 1533 n. 18.

When the Defendant produces a legitimate non-discriminatory reason for the alleged discrimination, the Plaintiff must prove that the legitimate reason offered was a mere pretext for an illegal motive.  McDonnell, 411 U.S. at 802.  As evidence of pretext, the Plaintiff asserts that McCravy, who was hired after the Plaintiff has always made more than the Plaintiff for doing substantially the same jobs - shipping and receiving materials.  Plaintiff also asserts that McCravy's pay was higher than Avery's even when Avery was in a lead position and McCravy was not.  The Plaintiff alleges that there is no explanation for this

17

disparity in pay other than race.  The Defendant has provided evidence that McCravy was hired into the distribution center to ship and receive printed materials when Plaintiff was still in a lead position in the mailroom, an entirely different department at a different location. The primary function of the mailroom was to receive, sort and distribute each day's mail throughout the corporate office.  (Avery Dep., p. 57-58).  The distribution center is a shipping and receiving operation, which is responsible for warehousing and shipping printed materials, marketing materials (*i.e.*, baseball caps, shirts, pens and the like) and other materials to outlying HealthSouth facilities around the country.  (Avery Dep., p. 60).  The record is undisputed that McCravy was already in the distribution center when Plaintiff was transferred there.   (Avery Dep., p. 85).   Furthermore, McCravy's experience and qualifications and the specialized job he performed warranted paying him a higher rate than other distribution center employees. (McKee Dec. ¶ 12).  Accordingly, the Court finds that Plaintiff has not satisfied his burden in producing sufficient evidence that the Defendant's proffered explanation is pretext for race-based discrimination in compensation as it relates to Jim McCravy.

Based on the foregoing reasons, the Court grants the Defendant's motion for summary judgment as to the Plaintiff's disparate pay race discrimination claim.

### B. <u>Discrimination in Promotions</u>

Plaintiff alleges that he was denied promotions and such positions were usually given to less senior and less qualified white employees, constituting disparate treatment race discrimination in promotions.  (Complaint and Amended Complaint ¶ 12).

A plaintiff alleging a Title VII discrimination in promotion claim must establish the

following elements: (1) that [he] is a member of a protected minority; (2) that [he] was qualified and applied for the promotion; (3) that [he] was rejected despite these qualifications; and (4) other equally or less qualified employees who are not members of the protected minority were promoted.  Lee v. GTE Florida, Inc., 226 F.3d 1249 (11th Cir. 2000) (citing Taylor v. Runyon, 175 F.3d 861, 866 (11th Cir. 1999); Alexander v. Fulton Co., 207 F.3d 1303, 1339 (11th Cir. 2000).  Once an employee has established a prima facie case, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.  Id.  If the employer meets this burden of production, the employee must then establish that the employer's proffered reasons were pretextual.  Id.  "In a failure to promote case, a plaintiff cannot prove pretext by simply showing that [he] was better qualified than the individual who received the position that [he] wanted.""A Plaintiff must show not merely that the defendant's employment decisions were mistaken but that they were in fact motivated by [race]."  Lee, 226 F.3d at 1253 (citing Alexander v. Fulton Co., 207 F.3d 1303 (11th Cir. 2000).  Plaintiff must instead adduce evidence that the disparity in qualifications was "so apparent as virtually to jump off the page and slap you in the face." Cofield v. Goldkist, Inc., 267 F.3d 1264, 1268 (11th Cir. 2001)(citing Denney, 247 F.3d at 1187 (11th Cir. 2001))(quoting Lee, 226 F.3d at 1253-54); accord Alexander, 207 F.3d at 1339-40 (all quoting Deines v. Texas Dep't of Protective & Reg. Servs., 164 F.3d 277, 280 (5th Cir. 1999)).  For the discrepancies to "jump off the page and slap you in the face," they must be of such weight and significance that no reasonable person could have chosen the selected candidate over the plaintiff.  Lee, 226 F.3d at 1254.

The Plaintiff alleges that he was subjected to discrimination in promotions when

Defendant promoted all white males, Jim McCravy, Sid Crocker, Fielding Martin, and Kerry Roberson, to positions that Plaintiff would have received absent discrimination based on race. In order to determine whether Plaintiff was subjected to discrimination in promotions, each of the named comparators will be addressed individually.

1. __Jim McCravy__[10]

It is undisputed that Plaintiff is a member of a protected minority group; he is black. The Defendant asserts that Plaintiff was not qualified for the position held by McCravy. The Defendant asserts that McCravy held a unique and specialized position involving the shipping of printing materials. In contrast, the Plaintiff asserts that the position held by McCravy was not a specialized position, but, instead was a shipping and receiving position. The Plaintiff asserts that it is not the kind of position which requires expert qualifications. Hence, Plaintiff asserts that he had worked in the mailroom for a sufficient number of years, such that he would have been able to qualify for this position. The Defendant provided evidence that while Plaintiff alleges he had experience for this position as the result of working in the mailroom, for less than two years (Avery Dep., p. 106), Plaintiff conceded that at the time, Plaintiff had the least experience of any employee in the distribution center. (Avery Dep., p. 108). Prior to transferring to the distribution center from the mailroom, Plaintiff did not have any previous experience in the distribution center or in the shipping of

_____

[10] The Defendant alleges that the Plaintiff's claim as it relates to his discrimination in pay claim as to McCravy is untimely. The Defendant asserts that McCravy did not receive a promotion or position change on or about March 7, 2000, but continued to perform the duties (as a mail and inventory clerk) that he was hired to perform in December, 1999. The Plaintiff asserts that McCravy was promoted to the position of print shop clerk on or about March 7, 2000, after David Dover was terminated; hence, his claim for discrimination in promotions as to McCravy is timely filed. As is our obligation at the summary judgment stage, we will resolve all disputes in favor of Plaintiff's version of events. Therefore, the Court finds Plaintiff's claim for discrimination in promotions as to McCravy timely.

printed materials.

Even assuming, however that Plaintiff was qualified for the position held by McCravy, Plaintiff cannot demonstrate that McCravy was equally or less qualified for the position of handling and shipping printed materials.  The Plaintiff asserts that the position held by McCravy was not rocket science, but a position that entailed shipping and receiving.  The Plaintiff also asserts that there cannot be too much of a difference in shipping and receiving materials printed by the HealthSouth print shop and materials printed elsewhere and mailed to HealthSouth through the mailroom.  The Defendant has provided evidence that McCravy was hired as a mailroom and inventory clerk in the distribution center in December, 1999, at the pay rate of $10.00 because of his 19 years of experience in similar positions.  McCravy had approximately 19 years of experience, all of which was in the shipping of printed materials at EBSCO, National Computer Print, Mail Enterprises, High Cotton, and other businesses.  Moreover, if the Court takes into consideration Plaintiff's experience, the Defendant has provided evidence that McCravy had well over fifteen years more experience than Plaintiff in handling and shipping printed materials.

Furthermore, Plaintiff cannot demonstrate that the Defendant's proffered legitimate nondiscriminatory reasons  for giving McCravy the position were  pretext for unlawful discrimination.  The Defendant proffers that it gave McCravy the position because of his experience and qualifications.  Plaintiff argues that he has demonstrated pretext in that Mike McKee had a "hand in all of the promotional decisions" and was the "main harasser at HealthSouth.  He concludes by stating that McKee's alleged discriminatory animus should be imputed to this employment decision.  Plaintiff testified in deposition that he has no knowledge or information as to why McCravy was selected for the position.  (Avery Dep.,

p. 109).  He also concedes in deposition that he has absolutely no evidence or information from any source to suggest that race was a factor in the selection.  (Avery Dep., p. 109).  The Court finds that Plaintiff has not presented substantial evidence to establish a discrimination in promotion claim as to McCravy.

2. **Sid Crocker**

Plaintiff contends that he should have been promoted to Sid Crocker's warehouse lead position.  Plaintiff alleges that he was qualified to be the lead person at the warehouse because he had worked in the warehouse at BellSouth, he had acquired computer data entry experience while at ContraTech, he was currently working at the distribution center at HealthSouth, and he had previously worked as lead person in the mailroom.  The Defendant has provided evidence that Plaintiff concedes that he had no warehouse supervisory or lead experience.  (Avery Dep., p. 127).  Although Plaintiff had some experience, the Defendant provided evidence that Plaintiff had previously been given an opportunity to serve as a lead person in the mailroom, but had to be removed from that position following an altercation with other mailroom employees and due to his lack of leadership and interpersonal skills.  (McKee Dec. ¶ 13).  Furthermore, the Defendant provided evidence that the Plaintiff's recurring attendance problems made him a poor candidate for any position that required regular attendance and reliability such as the warehouse lead position.[11]  (McKee Dec. ¶ 8).  Between December 18, 2000, and May 7, 2001, Plaintiff had been late to work over 50 days, had been 1-1.5 hours late on more than 25 days, left early several days, was absent several days, overused his vacation time and personal days, and had a negative balance of 24 hours

---

[11] In January, 2002 when Crocker was promoted to warehouse supervisor, Crocker had a good attendance record.  (McKee Dec. ¶ 8; ¶ 13).

22

of vacation time.  (Avery Dep., p. 172-173).

Even assuming, however that Plaintiff is qualified for the position, the Plaintiff cannot demonstrate that Crocker was equally or less qualified for the position.  The Defendant has provided evidence that Mr. Crocker was selected for the warehouse/distribution center lead position because of his excellent job performance, his seniority in the distribution center, and his good attendance record.  (McKee Dec. ¶ 8).  In addition, the Defendant provided evidence that Crocker also holds a college degree.  (McKee Dec. ¶13).

Furthermore, Plaintiff cannot demonstrate that the Defendant's proffered legitimate nondiscriminatory reasons  for giving Crocker the position were pretext for unlawful discrimination.  The Defendant proffers that it gave Crocker the position because of his excellent job performance, seniority in the distribution center, and good attendance record.  Plaintiff argues that he has demonstrated pretext in that Mike McKee had a "hand in all of the promotional decisions" and was the "main harasser at HealthSouth."  He concludes by stating that McKee's alleged discriminatory animus should be imputed to this employment decision.  Plaintiff testified in deposition that he has no understanding or information as to why Crocker was selected for the position.  (Avery Dep., p. 122).  He also concedes in deposition that he has absolutely no evidence or information to indicate that race was a factor in the selection.  (Avery Dep., p. 123).  In addition, the Plaintiff's alleged qualifications as compared to Crocker's do not "jump off the page and slap you in the face" nor are they such that no reasonable person could have chosen Crocker over the Plaintiff.  The Court finds that Plaintiff has not presented substantial evidence to establish a discrimination in promotion claim as to Crocker.

3. **Fielding Martin**

Plaintiff contends that he was qualified for the mailroom lead position, had previously held the position, and was a longtime employee of both the mailroom and the distribution room. The Defendant asserts that Plaintiff was not qualified for the position. The Defendant has provided evidence that Plaintiff had been removed from the position because of his altercation with two employees, Robert Vasser and Erwin Williams, and his lack of interpersonal and leadership skills. Since there was so much tension between Plaintiff and the other employees in his department after this incident, Plaintiff acknowledged that he was not comfortable working with the employees that were under him. (Avery Dep., p. 117). As a result, Plaintiff was removed from the mailroom and transferred to the distribution center. In addition, the Defendant provided evidence that Plaintiff's poor attendance record made him a poor candidate for any supervisory position or lead position. Although Plaintiff's attendance had improved around July, 2002, the Defendant provided evidence that Plaintiff still needed to work on his tardiness. (Avery Dep., Defendant Exhibit 9).

Even assuming, however that Plaintiff was qualified for the position, Plaintiff cannot demonstrate that Martin was equally or less qualified than Plaintiff or demonstrate pretext. The Defendant has provided evidence that Martin was selected to fill the lead position in the mailroom because of his excellent job performance, his organizational skills, his good work ethic, and his good attendance. (McKee Dec. ¶ 9). There is no evidence that Martin had poor interpersonal skills and poor attendance practices. In contrast, Plaintiff's attendance record was poor and he had been previously removed from this very position because of an altercation with subordinates.

Furthermore, Plaintiff cannot demonstrate that the Defendant's proffered legitimate nondiscriminatory reasons  for giving Martin the position was a pretext for unlawful discrimination.  The Defendant proffers that it gave Martin the position because of his excellent job performance, his organizational skills, his good work ethic, and his good attendance.  Plaintiff argues that he has demonstrated pretext in that Mike McKee had a "hand in all of the promotional decisions" and was the "main harasser at HealthSouth."  He concludes by stating that McKee's alleged discriminatory animus should be imputed to this employment decision.  Plaintiff testified in deposition that he has absolutely no evidence or information to indicate that race was a factor in the selection.  (Avery Dep., p. 123). Although the Plaintiff argues pretext by emphasizing that his attendance record improved in July, 2002, and poor attendance could not have been a legitimate reason for the denial of this promotion, the Defendant provided evidence that Plaintiff still needed to work on his tardiness.  (Avery Dep., Defendant Exhibit 9).  The Court finds that Plaintiff has not presented substantial evidence to establish a discrimination in promotion claim as to Martin.

## 4. <u>Kerry Roberson</u>

Plaintiff asserts that Kerry Roberson was placed in an entry level position in the print shop that Plaintiff could have been hired and trained to perform.  The Defendant asserts that Plaintiff was not qualified for the position.  McKee testified that the position was a pre-press position that coordinated negative stripping, plate burning, and film output.  (McKee Dec. ¶ 10).  The Defendant provided evidence that Plaintiff, who had only worked in the mailroom and warehouse and had never worked in the print shop or printing industry,  acknowledged that he had no training, experience, or qualifications in pre-press operations.  (Avery Dep., p. 110).

25

Even assuming, however, that Plaintiff was qualified for the position, Plaintiff can neither demonstrate that Martin was equally or less qualified than Plaintiff nor demonstrate pretext. Prior to being hired by HealthSouth, Roberson had previously worked in the printing industry at Craftsman Printing Company. (McKee Dec. ¶ 10). As a result of Roberson's qualifications and prior experience, he was considered by the Defendant to be more qualified for that position. In contrast, Plaintiff concedes that he had no training, experience, or qualifications in pre-press operations. In addition, the Plaintiff's alleged qualifications as compared to Roberson 's do not "jump off the page and slap you in the face" nor are they such that no reasonable person could have chosen Roberson over the Plaintiff.

Furthermore, Plaintiff cannot demonstrate that the Defendant's proffered legitimate nondiscriminatory reasons for giving Roberson the position were pretext for unlawful discrimination. The Defendant proffers that it gave Roberson the position because of his qualifications and prior experience. The Plaintiff argues that the fact that he did not know of the job until afer it had been filled is evidence of pretext. The Plaintiff has not provided any evidence to support this assertion. Plaintiff testified in deposition that he has no evidence or information to indicate that race was a factor in the selection. (Avery Dep. p. 110). The Court finds that Plaintiff has not presented substantial evidence to establish a discrimination in promotions claim as to Roberson.

Based on the foregoing reasons, the Court finds that Plaintiff has not established a prima facie case of discrimination in promotions. Accordingly, the Court grants the Defendant's motion for summary judgment.

### C.  Pattern and Practice of Race Discrimination

The Plaintiff asserts that the Defendant has a pattern and practice of race

26

discrimination.  To establish a pattern or practice of disparate treatment for purposes of a discrimination claim under Title VII, the employee must show by a preponderance of the evidence that intentional discrimination was the employer's standard operating procedure.  See Brazemore v. Friday, 478 U.S. 385, 398 (1986).  Hence, the Plaintiff must show that intentional discrimination was the Defendant's regular rather than the unusual practice.  (Id.)  The plaintiff can prove that discrimination was the standard operating procedure "through a combination of statistics and anecdotes."  Joe's Stone Crab, 220 F.3d at 1274.

Although the Plaintiff alleged in his complaint a pattern and practice of race discrimination, the Plaintiff has not produced any evidence to establish such claim of discrimination. "A party responding to summary judgment may not rest on [his] pleadings to demonstrate the presence of an issue of fact."  Miranda, 975 F.2d at 1533.  Accordingly, the Court finds that the Plaintiff has not established that intentional discrimination was the Defendant's standard operating procedure.  Therefore, the Plaintiff's claim fails as a matter of law.

### D.  Hostile Work Environment

The Plaintiff alleges that the Defendant subjected him to a racially hostile work environment.  The Defendant asserts that the Plaintiff doesn't present sufficient evidence to support a racially hostile work environment claim.  A plaintiff alleging a Title VII racially hostile work environment claim must establish the following elements: (1) the employee must belong to a protected group; (2) the employee must have been subjected to harassment; (3) the harassment must have been based on the race of the employee; (4) the harassment must have been sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there must be a basis for holding the employer liable for the

27

harassment, either directly or indirectly. <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269 (11th Cir. 2002); <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim). To be actionable under Title VII, the requirement that harassment must be sufficiently severe or pervasive to alter the terms or conditions of employment contains both an objective and a subjective component. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Hence, the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive. (<u>Id</u>.) In evaluating the objective severity of the harassment, the Eleventh Circuit has considered, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. <u>Miller</u>, 277 F.3d at 1276 (citing <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997).

The Plaintiff belongs to a protected class; he is African-American. The Plaintiff testified in deposition that he was subjected to a racially hostile work environment because: (1) Plaintiff heard several racial jokes told by white employees; (2) Plaintiff was not spoken to by his supervisor, Mozley, who would talk to white employees; (3) Plaintiff was not allowed to rotate to easier jobs in the distribution center; and (4) Plaintiff was monitored on cameras along with other black employees. In Plaintiff's reply brief to the Defendant's motion for summary judgment, he alleges for the first time in the lawsuit and contrary to his sworn deposition testimony that he was also subjected to a racially hostile work environment because: (1) Plaintiff was passed over for several promotions in favor of white employees;

and (2) Plaintiff was paid less than white employees.  The Defendant contends that Plaintiff's allegations that he was passed over for several promotions in favor of white employees and he was paid less than white employees should be rejected because they are post-discovery changes in his racially hostile work environment claim.  The Court finds that the Plaintiff was provided an opportunity in his deposition to identify specific employment actions that make up his racially hostile work environment claim.  The Plaintiff should not be allowed to expand his racially hostile work environment claim post discovery.  Even if the Court allowed these claims and considered them timely, the Plaintiff has failed to establish a racially hostile work environment claim.

1.     **Passed Over for Promotions**

The Plaintiff alleges that he was subjected to a racially hostile work environment because the Defendant promoted all white males, Jim McCravy, Sid Crocker, Fielding Martin, and Kerry Roberson, to positions that Plaintiff would  have received absent discrimination based on race.  As noted above, the Defendant provided evidence that the Plaintiff was not qualified for the positions.

**McCravy**

The Defendant asserts that McCravy held  a unique and specialized position involving the shipping of printing materials. The Defendant proffers that it gave McCravy the position because of his experience and qualifications.  The Defendant provided evidence that while Plaintiff alleges he had experience for this position as the result of working in the mailroom, for less than two years (Avery Dep., p. 106), Plaintiff conceded that at the time, Plaintiff had the least experience of any employee in the distribution center. (Avery Dep., p. 108).  Prior to transferring to the distribution center from the mailroom, Plaintiff did not have

any previous experience in the distribution center or in the shipping of printed materials.

The Defendant has provided evidence that McCravy was hired as a mailroom and inventory clerk in the distribution center in December, 1999, at the pay rate of $10.00 because of his 19 years of experience in similar positions.  McCravy had approximately 19 years of experience, all of which was in the shipping of printed materials at EBSCO, National Computer Print, Mail Enterprises, High Cotton, and other businesses.  In contrast, if the Court takes into consideration Plaintiff's experience, the Defendant has provided evidence that McCravy had well over fifteen years more experience than Plaintiff handling and shipping printed materials.  The Court finds that Plaintiff has not presented sufficient evidence to establish that McCravy was promoted over the Plaintiff on account of the Plaintiff's race.

### Crocker

The Plaintiff alleges that he was qualified to be the lead person at the warehouse because he had worked in the warehouse at BellSouth, he had acquired computer data entry experience while at Contra Tech, he was currently working at the distribution center at HealthSouth, and he had previously worked as lead person in the mailroom.  The Defendant has provided evidence that Plaintiff concedes that he had no warehouse supervisory or lead experience.  (Avery Dep., p. 127).  Although Plaintiff had some experience, the Defendant provided evidence that Plaintiff had previously been given an opportunity to serve as a lead person in the mailroom, but had to be removed from that position following an altercation with other mailroom employees and due to his lack of leadership and interpersonal skills. (McKee Dec. ¶ 13).  Furthermore, the Defendant provided evidence that the Plaintiff's recurring attendance problems made him a poor candidate for any position that required

30

regular attendance and reliability such as the warehouse lead position.[12]   (McKee Dec. ¶ 8).
Between December 18, 2000, and May 7, 2001, Plaintiff had been late to work more than 50
days, had been 1-1.5 hours late more than 25 days, left early several days, was absent several
days, overused his vacation time and personal days, and had a negative balance of 24 hours
of vacation time.  (Avery Dep., p. 172-173).

The Defendant has provided evidence that Crocker was selected for the
warehouse/distribution center lead position because of his excellent job performance, his
seniority in the distribution center, and his good attendance record.  (McKee Dec. ¶ 8).  In
addition, the Defendant provided evidence that Crocker also holds a college degree.  (McKee
Dec. ¶13).  The Court finds that Plaintiff has not presented sufficient  evidence to establish
that Crocker was promoted over the Plaintiff on account of the Plaintiff's race.

### Martin

Plaintiff contends that he was qualified for the mailroom lead position, had
previously held the position, and was a longtime employee of both the mailroom and the
distribution room.  The Defendant asserts that Plaintiff was not qualified for the position.
The Defendant has provided evidence that Plaintiff had been removed from the position
because of his altercation with two employees, Robert Vasser and Erwin Williams, and his
lack of interpersonal and leadership skills.  Since there was so much tension between
Plaintiff and the other employees in his department after this incident, Plaintiff
acknowledged that he was not comfortable working with the employees that were under him.
(Avery Dep., p. 117).  As a result, Plaintiff was removed from the mailroom and transferred

---

[12] In January, 2002 when Crocker was promoted to warehouse supervisor, he had a good
attendance record.  (McKee Dec. ¶ 8; ¶ 13).

to the distribution center.  In addition, the Defendant provided evidence that Plaintiff's poor attendance record made him a poor candidate for any supervisory position or lead position. Although Plaintiff's attendance had improved around July, 2002, the Defendant provided evidence that Plaintiff still needed to work on his tardiness.  (Avery Dep., Defendant Exhibit 9).

The Defendant has provided evidence that Martin was selected to fill the lead position in the mailroom because of his excellent job performance, his organizational skills, his good work ethic, and his good attendance.  (McKee Dec. ¶ 9).  There is no evidence that Martin had poor interpersonal skills and poor attendance practices.  In contrast, Plaintiff's attendance record was poor and he had been previously removed from this very position because of an altercation with subordinates.  The Court finds that Plaintiff has not presented sufficient  evidence to establish that Crocker was promoted over the Plaintiff on account of the Plaintiff's race.

**Roberson**

Plaintiff asserts that Kerry Roberson was placed in an entry level position in the print shop that Plaintiff could have been hired and trained to perform.  The Defendant asserts that Plaintiff was not qualified for the position.  McKee testified that the position was a pre-press position that coordinated negative stripping, plate burning, and film output.  (McKee Dec. ¶ 10).  The Defendant provided evidence that Plaintiff, who had only worked in the mailroom and warehouse and had never worked in the print shop or printing industry,  acknowledged that he had no training, experience, or qualifications in pre-press operations.  (Avery Dep., p. 110).

Prior to being hired by HealthSouth, Roberson had previously worked in the printing

industry at Craftsman Printing Company.  (McKee Dec. ¶ 10).  As a result of Roberson's qualifications and prior experience, he was considered by the Defendant to be more qualified for that position.  In contrast, Plaintiff concedes that  he had no training, experience, or qualifications in pre-press operations.  The Defendant proffers that it gave Roberson the position because of his qualifications and prior experience.  In addition, Plaintiff testified in deposition that he has no evidence or information to indicate that race was a factor in the selection.  (Avery Dep. p. 110).  The Court finds that Plaintiff has not presented sufficient evidence to establish that Roberson was hired over the Plaintiff on account of the Plaintiff's race.

Based on the foregoing, the Plaintiff has not provided substantial evidence to establish a racially hostile work environment claim.

## 2. Discrimination in Compensation

The Plaintiff alleges that he was subjected to a racially hostile work environment because the Defendant paid him less than Jim McCravy who performed substantially the same job as him.  As noted above, the Defendant provided evidence that the Plaintiff cannot establish a claim of discrimination in compensation.

Plaintiff  was initially employed as a mail and inventory clerk in the mailroom; he later transferred to the distribution center.  Plaintiff's position in the distribution center required him to fill orders for either human resources or marketing materials.  McCravy, a white male, was a mail and inventory clerk in the distribution center who was solely responsible for the shipping and receiving of printed materials for the print shop.  It is undisputed that McCravy received a higher wage than the Plaintiff.  The Plaintiff acknowledged that there is a "special job where someone did the printing shipping." (Avery

33

Dep., p. 95).  The Defendant provided evidence that McCravy was  responsible for the shipping and receiving of printed materials for the print shop. (McKee Dec.¶ 12).  Plaintiff further confirmed that McCravy's job also required him to do any computer entries, billing, or invoicing that went with shipping printing materials. (Avery Dep., p. 96-97).  In contrast, Plaintiff admitted that he and other distribution clerks handled only the shipping of non-print shop materials.  (Avery Dep., p. 97).  Although both positions entail the receipt and delivery of preprinted materials to outlying HealthSouth facilities, the two positions are district.

The Defendant also provided evidence that McCravy's significant prior work experience warranted paying him a higher salary than Plaintiff.  McCravy had approximately 19 years of experience, all of which was in the shipping of printed materials at EBSCO, National Computer Print, Mail Enterprises, High Cotton, and other businesses.

The Defendant has provided evidence that McCravy was hired into the distribution center to ship and receive printed materials when Plaintiff  was still in a lead position in the mailroom, an entirely different department at a different location.  The primary function of the mailroom was to receive, sort, and distribute each day's mail throughout the corporate office. (Avery Dep., p. 57-58).  The distribution center is a shipping and receiving operation, which is responsible for warehousing and shipping printed materials, marketing materials (*i.e.*, baseball caps, shirts, pens and the like), and other materials to outlying HealthSouth facilities around the country. (Avery Dep., p. 60).  The record  is undisputed that McCravy was already in the distribution center when Plaintiff was transferred there.  (Avery Dep., p. 85).  Furthermore, McCravy's experience and qualifications and the specialized job he performed warranted paying him a higher rate than other distribution center employees. (McKee Dec. ¶ 12).  Accordingly, the Court finds that Plaintiff has not satisfied its burden

in producing sufficient evidence to establish that Plaintiff was paid less than McCravy on account of race.   Therefore, the Plaintiff has not established a racially hostile work environment claim.

**3.     Plaintiff Watched on Cameras by McKee**

The Plaintiff alleges that he and other black employees were monitored on cameras by McKee.  The Defendant has provided undisputed evidence that, since 1997, when the building that houses the print shop and distribution center was built, the security cameras inside that facility have been operational and in the same location.  (McKee Decl. ¶ 5). Plaintiff testified that the security cameras had been in the print shop and the distribution center the entire time he had been at HealthSouth.  (Avery Dep., p. 193; 196).   The Defendant's cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).   The Defendant contends that this was needed because of the cost and sophistication of that particular press.  (McKee Decl. ¶ 5).  Since the six-color press is highly sensitive and susceptible to thousands of dollars of damage, it is important that the area around that press be monitored and that only persons assigned to that press be in that area.  (McKee Decl. ¶ 5).   The Plaintiff acknowledges that the security cameras in the distribution center were not just focused on the area in which he worked; rather, it was focused on the entire warehouse and everyone who worked in it.  (Avery Dep., p. 208).  Plaintiff further testified that he assumed that the cameras had been on prior to being told they were on.  (Avery Dep., p. 206).

In or around December, 2001, McKee had a monitor placed in his office that was connected to the security cameras.  (McKee Decl. ¶ 6).  This monitor shows the same camera

views that are shown in the security office. (McKee Decl. ¶ 6). The Defendant contends that the monitor was connected for several reasons. (McKee Decl. ¶ 6). One reason was because of the recently discovered problems with print shop employees improperly checking in and out for work and lunch breaks. (McKee Decl. ¶ 6). One camera showed a view of the time clock and McKee was able to check employees as they clocked in and out. (McKee Decl. ¶ 6). Another reason McKee monitored the monitors was to observe the six-color press. (McKee Decl. ¶ 6). As noted above, the six-color press was extremely expensive and a highly sensitive press and needed to be able to be observed at any time. (McKee Decl. ¶ 6). In addition, around this time the amount of business being handled by the print shop and distribution center was increasing, leading to an increase in the number of outside truckers coming in and out of the distribution center. (McKee Decl. ¶ 6). McKee was concerned, for security reasons, with observing the areas of the distribution center where the outside truckers would enter and exit the building. (McKee Decl. ¶ 6). The Defendant contends that none of these cameras have ever been located to monitor a particular employee or group of employees. (McKee Decl. ¶ 6). The Plaintiff has not provided any evidence to establish that the cameras were arranged and monitored to discriminate against the Plaintiff on account of his race or that the arrangement of and monitoring by the cameras was severe and pervasive so as to alter the terms or conditions of his employment.

4.      **Racial Jokes Made By McCravy and Metros**

The Plaintiff alleges that he was subjected to several racial jokes told by co-workers, McCravy and Metros. However as it relates to the alleged jokes made by Metros and McCravy, the Plaintiff cannot remember anything about those jokes, much less recite the specifics or substance of even one of the jokes that they allegedly told. (Avery Dep. P. 132-

36

133).  The Defendant has provided evidence that the Plaintiff testified that McCravy allegedly made four or five (perhaps more) racially offensive jokes over the past three years and that Metros made one racially offensive joke at an employee appreciation lunch a long time ago.  (Avery Dep., p. 133-137).  Moreover, Plaintiff admits that he never reported the alleged comments to anyone.[13]  (Avery Dep., p. 137-138).

Other than these two occasions, Plaintiff has never heard anyone at HealthSouth make any racially offensive or inappropriate comments.  (Avery Dep., p. 137).  Plaintiff is unable to recall and describe the allegedly offensive remarks by Metros and McCravy, much less make a demonstration with substantial evidence that the alleged conduct was so severe or pervasive that this alleged conduct altered the terms and conditions of his employment.

## 5.   Plaintiff Was Not Allowed To Rotate To Easier Jobs In The Distribution Center

The Plaintiff alleges that he was not allowed to rotate to easier jobs in the distribution center.  The Defendant contends that the Plaintiff has not provided evidence that Mozley restricted him from working on a particular side in the distribution center.  Plaintiff testified

---

[13] In two seminal opinions released by the Supreme Court in 1998, Faragher v. City of Boca Raton, 524 U.S. 775 (1998) and Burlington Industries v. Ellerth, 524 U.S. 742 (1998), the Court established an affirmative defense for employers whose supervisors are alleged to have sexually harassed another employee under Title VII.  Provided that the alleged harassment does not result in a tangible employment action, the employer will avoid liability if (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior; and (b) the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.  See Ellerth, 524 U.S. at 765.  As there has been no tangible employment action resulting from the harassment, the Faragher/Ellerth affirmative is available to HealthSouth in the present instance.

HealthSouth has a well published policy against harassment based on any protected class membership.  (Avery Dep., Defendant's Exhibit 10).  Plaintiff admits that he was aware of this policy.  (Avery Dep., p. 188-190).  Furthermore, Plaintiff testified that he did not report the alleged comments of McCravy or Metros to anyone at HealthSouth.  (Avery Dep., p. 137-138).  Based on these facts and the Faragher defense, HealthSouth cannot be held liable for any alleged harassment that was directed towards Plaintiff by either McCravy or Metros.

that new employees (who happened to be white) to the distribution center were initially trained on the human resources side rather than the marketing side where he tended to work. (Avery Dep., p. 146).  The Plaintiff believes this was racial harassment because he was the only black in the distribution center.   (Avery Dep., p. 146, 153) Nevertheless, the Plaintiff admits that it is easier to train a new employee on the human resources side.  (Avery Dep., p. 147).  He also concedes that, at the time he complained, he was not a new employee and was the most experienced employee as to both sides of the warehouse.  (Avery Dep., p. 148, 153).  The Plaintiff acknowledges that there was nothing less desirable about working one side versus the other side.  (Avery Dep., p. 140).

Moreover, Plaintiff concedes that, during the 12-13 months he worked in the distribution center prior to his complaint to Ealy and Mozley, he worked both sides of the warehouse.  (Avery Dep., p. 144).  It was only for a short time when new inexperienced employees were hired into the distribution center that he was assigned the marketing side and even then he worked both sides at times.  (Avery Dep., p. 142-143, 145-148).  The Plaintiff testified that there was nothing less desirable about working on one side versus the other side.  (Avery Dep., p. 140).  The Plaintiff also testified that, over the three years he worked in the distribution center, his work was split evenly (33% each) between working the human resources side, working the marketing side, and doing shipping work.  (Avery Dep., p. 211-212).  The Plaintiff has not provided any evidence to establish that the lack of job rotation was intended to discriminate against the Plaintiff on account of his race or that it was  severe and pervasive so as to alter the terms or conditions of his employment

**6.**     **Plaintiff was not Spoken to by his Supervisor**

The Plaintiff alleges that Mozley, his supervisor, only talked to the employees who

liked to hunt and did not speak to him and the other black employees.  When Mozley and McKee talked to Plaintiff on May 11, 2001, about his complaints, Plaintiff admitted that Mozley did talk to him about personal, non-work matters, but he was upset because Mozley had not spoken to him on a personal matter in three days.  (Avery Dep., p. 173-174; McKee Decl. ¶ 26).  The Defendant contends that a determination that an unfriendly supervisor creates a hostile work environment would turn Title VII into a "general civility code," against which the United States Supreme Court has  warned.  See, Faragher, 524 U.S. at 789.  Title VII jurisprudence does prohibit using Title VII to police "ordinary socializing in the workplace" as discriminatory conditions of employment.  Oncale v. Sundower Offshore Services, Inc., 523 U.S. 75, 81 (1998).  Therefore, courts are required to consider whether the alleged discriminatory act is severe or pervasive enough to create an objectively hostile or abusive work environment.  The Court is required to consider  frequent or severe discriminatory conduct, physically threatening, or humiliating conduct, or any discriminatory conduct that unreasonably interfered with Plaintiff's job performance.  Plaintiff has not provided evidence that Mozley's speaking only to employees who hunted was frequent, severe, physically threatening, or humiliating.  The Court finds that Plaintiff has not provided sufficient evidence to establish that McKee's alleged unfriendly conduct was based on race or was severe or pervasive enough to create an objectively hostile or abusive work environment.

Accordingly, the Court finds that the Plaintiff has presented insufficient evidence to establish a racially hostile environment claim.  Therefore, the Defendant's motion for summary judgment is granted as to this claim.

### E.  Retaliation Claim

The Plaintiff alleges in his complaint that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and retaliation; however, no corrective action was taken by the Defendant and further Plaintiff was subjected to retaliation.  The Plaintiff alleges that he was retaliated against by the Defendant when: (1) the Defendant placed a camera in McKee's office to monitor him and other black employees; and (2) he did not receive a promotion to mailroom lead in January, 2002, because of his complaints.  The Defendant asserts that: (1) the camera allegation does not constitute an adverse employment action as a matter of law; and (2) even if the camera allegation is considered an adverse employment action, Plaintiff fails to allege that he suffered adverse employment actions causally connected to any protected activity.  The protected activity in which Plaintiff engaged was reporting allegations to Ealy in May, 2001, and filing a charge of discrimination with the EEOC in June, 2001.

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) that there was a causal link between his protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the

retaliation claim is characterized as "direct" or "circumstantial" evidence.

**1.  Camera To Watch Over Him And The Other Black Employees**

The Defendant relies on <u>Davis v. Town of Lake Park, Florida</u>, 245 F.3d 1232 (11th Cir. 2001) to assert that being monitored by cameras does not constitute an "adverse employment action."  In <u>Davis</u>, the Eleventh Circuit established a standard for determining whether an employment action is adverse.  The Court held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.  245 F.3d t 1239.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. <u>Id</u>.

In the present case, Plaintiff cannot demonstrate that the placement and monitoring of cameras in the distribution center caused a serious and material change in the terms and conditions of his employment.  The Defendant has provided undisputed evidence that, since 1997, when the building that houses the print shop and distribution center was built, the security cameras inside that facility have been operational and in the same location.  (McKee Decl. ¶ 5).   The Defendant assets that its cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).   Since the six-color press is highly sensitive and susceptible to thousands of dollars of damage, it is important that the area around that press be monitored and that only persons assigned to that press be in that area.  (McKee Decl. ¶ 5). The Defendant contends that cameras were needed because of the cost and sophistication of that particular press.  (McKee Decl. ¶ 5).  In addition, a

secondary set of monitors was installed in McKee's office as the result of his discovery of widespread time clock abuse in December, 2001. (McKee Decl. ¶ 6). The secondary set of monitors also allowed McKee to observe the outside truckers coming in and out of the facility. (McKee Decl. ¶ 6). In addition, the placement and monitoring of the cameras in the distribution center did not result in a decrease in salary, demotion, or disciplinary action for the Plaintiff or the other black employees. The Plaintiff has not provided evidence to establish that these security cameras caused some serious and material change in the terms, conditions, or privileges of his employment.

Furthermore, the Plaintiff can neither establish a causal connection between the installation of the cameras and/or monitors and his complaints of discrimination nor demonstrate pretext. It is undisputed that the security cameras were put in place when the building was built in 1997. The Plaintiff testified in deposition that the cameras had been up the entire time he was there (even before he transferred to the distribution center) and that, while no one told him they were on, he assumed that they were operational and on. (Avery Dep., p. 205-206). It is also undisputed that the camera  monitors placed in McKee's office were installed in December, 2001. The Defendant asserts that the temporal proximity between Smith's May, 2001, complaint or his most recent complaint in June, 2001, and the installation of the monitors in December, 2001, ( a seven month period) strongly suggests that there is no connection between the two events. The Defendant relies on case law holding that a three and a half month period between protected activity and termination did not, standing alone, show pretext. Wasura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001). Notwithstanding, the general case law in the Eleventh Circuit establishes that for purposes of a prima facie case, close temporal proximity may be sufficient to show that the

42

protected activity and the adverse action were not wholly unrelated. Gupta, 212 F.3d at 590.

It is apparent that there is no close temporal proximity between the installation of the cameras in 1997 and the Plaintiff's protected activity.  Assuming that the Plaintiff has established close temporal proximity as to the camera monitors in McKee's office, the Defendant has proffered legitimate, nondiscriminatory, and nonretaliatory reasons for the security cameras.  The  Defendant has provided evidence that the monitors were installed to monitor time clock abuse by several employees and for security purposes.  Furthermore, the fact that McKee allegedly told Derrick Thomas that "things were going to get tough," without more, bears no significance in demonstrating pretext for the decisions made regarding Plaintiff.  Plaintiff does not offer the context in which the statement was allegedly made to Thomas. The Plaintiff has not provided evidence to establish that the Defendant's proffered nondiscriminatory and nonretaliatory  reasons for its employment decisions were pretextual and that the real reasons behind its actions were retaliatory.

## 2. Promotions Received By Martin and Crocker

The Plaintiff asserts that he was subjected to retaliation when he was denied promotions given to Martin and Crocker.  It is undisputed that the denial of promotions is an adverse employment action.  The Defendant asserts that Plaintiff cannot establish a causal connection between the promotion received by Martin and Crocker and Avery's complaint to human resources or his EEOC charge.  The Defendant has provided evidence that the Plaintiff testified in deposition that he has no evidence to suggest that he was denied the positions because of his complaints to human resources or his EEOC charge. (Avery Dep., p. 116, 123).  As discussed above, the Defendant provided evidence that Plaintiff was not qualified for either of the positions. The record is undisputed that Martin and Crocker

43

received the promotions because of their performance and experience.  The Defendant asserts that the temporal proximity between Avery's May, 2001, complaint or his most recent complaint in June, 2001, and Crocker's promotion to the distribution center lead in January, 2002, ( a six to eight month period) strongly suggests that there is no connection between the two events.[14]  The Defendant relies on case law holding that a three and a half month period between protected activity and termination did not, standing alone, show pretext.  Wasura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001).  Notwithstanding, the general case law in the Eleventh Circuit establishes that for purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated.  Gupta, 212 F.3d at 590.

It is apparent that there is no close temporal proximity between Martin's promotion in 2002 and the Plaintiff's protected activity.  Assuming, however that the Plaintiff has established close temporal proximity as to Crocker's and Martin's promotion, the Defendant has proffered legitimate, nondiscriminatory, and nonretaliatory reasons for the security cameras.  The Defendant has provided evidence that Plaintiff was not qualified for either of the positions and that Martin and Crocker received the promotions because of their performance and experience.  Furthermore, the fact that McKee allegedly told Derrick Thomas that "things were going to get tough," without more, bears no significance in demonstrating pretext for the decisions made regarding Plaintiff.  Plaintiff does not offer the context in which the statement was allegedly made to Thomas.  The Plaintiff has not provided evidence to establish that the Defendant's proffered nondiscriminatory and

---

[14] Martin was promoted to the lead position in July, 2002.  There is no close temporal proximity between Avery's May, 2001, complaint or his most recent complaint in June, 2001, and Martin's promotion.

nonretaliatory reasons for its employment decisions were pretextual and that the real reasons behind their actions were retaliatory.

Based on the foregoing reasons, the Court finds that Plaintiff has not established a claim of retaliation.

### V. Conclusion

For the reasons set forth above, the Court grants the Defendant's motion for summary judgment as to Plaintiff's discrimination and retaliation claims.

**DONE** and **ORDERED** this 25th day of March, 2005.

_____
**VIRGINIA EMERSON HOPKINS**
**United States District Judge**

45