FILED

2005 Mar-25  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **DERRICK THOMAS, TIM AVERY** | ] | |
| **KEDRIC HOOKS, ROBERT SMITH,** | ] | |
| **and ROBERT VASSER,** | ] | |
| | ] | |
| **PLAINTIFFS,** | ] | |
| | ] | |
| **v.** | ] | **Case No.  CV-02-VEH-0565-S** |
| | ] | |
| **HEALTHSOUTH CORPORATION** | ] | |
| | ] | |
| **DEFENDANT.** | ] | |

**MEMORANDUM OF DECISION**

This Court has before it the August 4, 2003, motion of Defendant HealthSouth

Corporation for summary judgment as to Plaintiff Robert Smith's claims.  (Doc. 28)

**I.  Procedural History**

Plaintiffs Robert Smith, Derrick Thomas, Tim Avery, Robert Vasser, and Kedric Hooks

commenced this action on March 4, 2002, by filing a complaint in this Court alleging separate

and individual  violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981.[1]   On August 1, 2002,

Plaintiffs filed a Motion to Amend Complaint which was granted on August 5, 2002.  In his

complaint, as amended, Plaintiff Smith contends that, throughout his employment, Defendant

---

[1] The claims of Plaintiff Kedric Hooks (deceased) were dismissed by this Court on April 17, 2003.  The claims of the three other remaining Plaintiffs (Vasser, Avery, and Thomas) are the subject of separate pending summary judgment motions filed contemporaneously with the summary judgment motion regarding Plaintiff Smith.

subjected him to both a racially hostile work environment and disparate pay race discrimination by paying him less than similarly situated white employees.[2]  Plaintiff also alleges that he was denied promotions and such positions were usually given to less senior and less qualified white employees, constituting disparate treatment race discrimination in promotions.[3]  In addition, Plaintiff contends that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and retaliation; however, no corrective action was taken by the Defendant and he was further subjected to retaliation.  The Plaintiff asserts that the Defendant has a pattern and practice of race discrimination.

On August 4, 2003, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff has failed to make a prima facie case of disparate pay race discrimination, race discrimination in promotions, and retaliation;  (2) that even if Plaintiff has established a prima facie case as to  his discrimination and retaliation claims, Plaintiff has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions and cannot demonstrate that the Defendant's decisions were pretextual; (3) that Plaintiff has failed to establish the essential elements of a racially hostile work environment claim by providing substantial evidence that he was subjected to severe or pervasive racial harassment that altered the terms or conditions of his employment; and (4) that Plaintiff has failed to establish by substantial evidence  a pattern or practice of race discrimination claim.

---

[2]  Plaintiff asserts in his brief in response to Defendant's motion for summary judgment that he is not pursuing a claim for discrimination in pay.  Therefore, that claim has been abandoned.

[3]  Plaintiff asserts in his brief in response to Defendant's motion for summary judgment that he is not pursuing a claim for discrimination in promotions.  Therefore, that claim has been abandoned.

The Defendant has submitted evidence[4] in support of its motion for summary judgment and filed a supporting brief on August 4, 2003. On September 5, 2003, the Plaintiff filed a brief in response to the Defendant's motion for summary judgment. The Plaintiff did not file evidence in opposition to Defendant's motion for summary judgment. The Defendant filed a reply brief on September 26, 2003.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 323. Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial. Id. at 324.

The substantive law will identify which facts are material and which are irrelevant.

---

[4] The Defendant submitted the depositions of Plaintiff Robert Vasser, Plaintiff Timothy Avery, Plaintiff Robert Smith, Plaintiff Derrick Thomas, Tricia Ealy, Mike McKee, a declaration by Tricia Ealy (Wells), and a declaration by Mike McKee. References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.," followed by the page number or the deposition exhibit being referenced.

Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the

4

burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[5]

Robert Smith, the Plaintiff, was hired by HealthSouth on July 28, 1997, in a post-press bindery position in the print shop at a starting salary of $16.50 per hour.  (Post-Press Person Level 3).  The print shop is divided into three separate areas/functions - pre-press, press, and post-press operations.  Pre-press operations consist of computerized graphics and layout work that is done prior to the production of any printed material.  (Smith Dep., 102-103).  The press operations consist of the actual printing of the magazine or paperwork (i.e., loading paper, setting up printing presses, and operating the printing presses).  (Smith Dep., 102-103).  The post-press operations

---

[5] Facts are undisputed unless otherwise expressly noted.

5

refer to the cutting, folding, binding and assembly functions which occur after the pages and/or papers are printed.  (Smith Dep., p. 104).

Smith  initially operated the cutter machine and from time to time operated the folder and stitcher machines.  (Smith Dep., p. 107).  Eventually he became a full-time cutter operator.  Id. During his employment at HealthSouth, Smith was supervised by Tim Tucker, then Danny Kirkland, and finally Mark Tucker.  (Smith Dep., p. 102). Mike McKee served as the manager over the entire operation.  Id.

In May, 2001, Smith and Derrick Thomas, another plaintiff in this matter, scheduled a meeting with Tricia Ealy, Director of Human Resources.  (Smith Dep., p. 177-179).  During this meeting, Smith and Thomas raised what they believed to be concerns about race discrimination. (Smith Dep., p. 179).  Smith's specific complaint was that, according to the temporary secretary, McKee had limited her work duties to only answering the phone. (Smith Dep., p. 180-182).  He also complained to Ealy that Kirkland and McKee had not scheduled him to work overtime on a Saturday when the annual report was being generated, while other employees who were white were allowed to do so.  (Smith Dep., p. 187).  In addition, Smith complained that black employees who were sick would not be spoken to by the supervisor upon their return to work and that he and/or Thomas had referred several employees to work at HealthSouth who had not been hired. (Ealy Dep., p. 28-29, 34).  Smith also raised a concern that other employees were allowed to operate his machine.  (Ealy Dep., p. 35).

After meeting with McKee and Kirkland, Ealy met again with Smith to report what she had learned and to address each of his issues.  She explained to Smith that the overtime issue was a misunderstanding.  (Ealy Dep., 36; Smith Dep., p. 190).  Smith testified that he did not think

6

it was a misunderstanding and that Kirkland "wanted it that way." (Smith Dep., p. 191). Ealy also failed to address other issues to Smith's satisfaction and Smith walked out of the meeting stating that he was going to the EEOC.[6]

In September, 2001, Smith complained to Ealy that he felt that he was being further discriminated or retaliated against because his time sheet was held while other employees' timesheets were being turned in and that his pay check did not reflect the hours that he worked and submitted. (Smith Dep., 197-198). He also complained that after he used the print shop copy machine and paper got caught in it, a sign was placed on the machine forbidding employees from making copies. (Wells Dec. ¶ 1). Finally, he complained that security cameras had been placed in the print shop and McKee's office which continuously monitored him. (Wells Dec. ¶ 1).

Ealy investigated his complaints and found that his timesheet, along with the timesheets of several other employees, had been withheld because there were some missed punches. Ealy p. 55; Attachments to Wells Dec.). Regarding the copy machine, McKee informed Ealy that, on a previous occasion, Smith had used the copier to copy flyers for his personal business without the consent or knowledge of managers. (Attachment to Wells Dec.) As a result, the sign was placed on the copy machine to restrict all employees from using the copy machine for personal business. Id. McKee also informed Ealy that the security cameras had been in place ever since the print shop moved to the new facility some five years earlier. (Wells Dec. ¶ 2).

In December, 2001, Smith and McKee met concerning time clock procedures. (Smith Dep., p. 196). McKee informed Smith that he had been seen clocking out for lunch for a thirty

---

[6] According to Ealy, she explained that the cutting machine was not simply "his" machine (*i.e.*, that other employees had to operate that machine from time to time, especially if Smith was late or not there) but that the supervisor indicated that they would work that out. (Ealy Dep., 36).

minute period, but taking more than thirty minutes for lunch.  (Smith Dep., p. 196).  Smith asked to see Jack Hawkins and informed McKee that other employees were guilty of the same conduct that  he was accused of practicing. (Smith Dep., p. 196; McKee Dep., p. 74; McKee Dec. ¶ 19). When McKee discovered that several employees had engaged in the same conduct as Smith, he issued a memo to the entire staff which restated the policy on time recording and the lunch period and warned of consequences of violating the policy.  (McKee Dep., p. 79, McKee Dep. Exhibit 6).

On March 4, 2002, Smith filed this lawsuit against HealthSouth.  On March 27, 2002, Smith pulled his back while lifting a box and reported the same to his supervisor, Mark Tucker. (Smith Dep., p. 36, 38).  Smith applied for worker's compensation benefits and was referred to Dr. Chandler for treatment.  (Ealy Dep., p. 49, 56).  Dr. Chandler released Smith to go back to work with no restrictions on April 24, 2002.  (Smith Dep. Def. Exhibit 2).  Nevertheless, Smith then requested a panel of doctors for the purpose of obtaining a second opinion.  HealthSouth granted the request and  Smith selected Dr. Martin Jones.   (Smith Dep., p. 49-50).  Dr. Jones evaluated Smith, but he did not provide any treatment.  Id.  Dr. Jones released Smith on June 25, 2002, to return to work by July 1, 2002.  (Smith Dep., p. 49-50; Ealy Dep., p. 56).  Between June 25 and July 1, 2002, Ealy contacted Smith to confirm Dr. Jones' release and to instruct Smith that he needed to return to work by July 1, 2002.  (Smith Dep., p. 52; 66-67).  Plaintiff informed Ealy that his personal physician, Dr. Adams, did not want him to return to work, but if he did return Dr. Adams would place a twenty-five pound weight restriction on Smith's lifting.  (Smith Dep., p. 52).  Ealy told Smith that he would have to return to work under HealthSouth's terms or not return at all.  (Smith Dep., p. 53).  As a follow-up to the conversation, Ealy wrote Smith a letter

informing him that he should return to work no later than July 8, or he would be considered to have resigned from his job. (Ealy Dep., p. 50-51; Ealy Dep. Pl. Exhibit 4).  The letter did not mention anything about HealthSouth granting Smith's request for a lifting restriction.  (Ealy Dep. Pl. Exhibit 4).  Although Smith should have returned to work on July 1, 2002, HealthSouth effectively gave Smith seven days of personal leave between July 1st  and July 8th to decide whether to return to work and maintain his employment with HealthSouth.   Despite the consequences, Smith failed to comply with Ms. Ealy's request; he did not return to work, contact his supervisor, human resources, or anyone else in management at HealthSouth.  In deposition testimony Smith admits that, upon receiving the July 1, 2002, letter from Ms. Ealy, he clearly understood that if he did not return to work or contact HealthSouth by July 8, 2002, he would be considered to have resigned from his job.  (Smith Dep., p. 58).  Since Smith did not return to work or contact HealthSouth as instructed, he was considered to have resigned his employment with HealthSouth on July 8, 2002. Id.

## IV.  Applicable Substantive Law and Analysis

Plaintiff claims  race-based disparate treatment in compensation and promotions, and retaliation under Title VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[7]  The Court is aware that the summary judgment rule applies in

---

[7]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs.,

job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

---

Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

10

"In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527.  Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally.  <u>See id.</u> at 1527-28.  The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation.  <u>See, e.g.</u>, <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983).  In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[8]  <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 (hiring); <u>Holifield v. Reno</u>, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); <u>see also</u> <u>Nix</u>, 738 F.2d at 1185 (discipline); <u>Pittman v. Hattiesburg Mun. Separate Sch. Dist.</u>, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and thereby has created the presumption of discrimination, the burden of production shifts to the employer to articulate

---

[8] <u>See also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

a legitimate, nondiscriminatory reason for its actions.[9]  See Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[10]  Where the defendant articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the McDonnell Douglas and Burdine framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Burdine, 450 U.S. at. 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment motion either

---

[9]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

[10]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[11] St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000); Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law); Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

## A.  Pattern and Practice of Race Discrimination

The Plaintiff asserts that the Defendant has a pattern and practice of race discrimination. To establish a pattern or practice of disparate treatment for purposes of a discrimination claim under Title VII, the employee must show by a preponderance of the evidence that intentional discrimination was the employer's standard operating procedure. See Brazemore v. Friday, 478 U.S. 385, 398 (1986). Hence, the Plaintiff must show that

---

[11]The court in Chapman modified the statement in Combs contrary to this holding in Reeves after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law. See Chapman, 229 F.3d at 1025, n.11.

13

intentional discrimination was the Defendant's regular rather than the unusual practice. (Id.)
The plaintiff can prove that discrimination was the standard operating procedure "through
a combination of statistics and anecdotes." Joe's Stone Crab, 220 F.3d at 1274.

Although the Plaintiff alleged in his complaint a pattern and practice of race
discrimination, the Plaintiff has not produced any evidence to establish such claim of
discrimination. "A party responding to summary judgment may not rest on [his] pleadings
to demonstrate the presence of an issue of fact." Miranda, 975 F.2d at 1533. Accordingly,
the Court finds that the Plaintiff has not established that intentional discrimination was the
Defendant's standard operating procedure. Therefore, the Plaintiff's claim fails as a matter
of law.

## B. Retaliation Claim

Generally, to establish a prima facie case of retaliation a plaintiff must show: (1) that
he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he
suffered an adverse employment action; and (4) there was a causal link between his protected
activity and the adverse employment action. Maniccia v. Brown, 171 F.3d 1364, 1369 (11th
Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)). The causal
link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has
stated that "a plaintiff merely has to prove that the protected activity and the negative
employment action are not completely unrelated." Id. at 1460, quoting EEOC v. Reichhold
Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993). The allocation of the evidentiary
burdens will be determined by whether the evidence for establishing the retaliation claim is
characterized as "direct" or "circumstantial" evidence.

Plaintiff alleges that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and retaliation; however, no corrective action was taken by the Defendant and he was further subjected to retaliation. Plaintiff engaged in statutorily protected activity by making complaints to Ealy in May, 2001, filing an EEOC charge in June, 2001, and filing this suit in March, 2002.  The Plaintiff asserts  that he was retaliated against when (1) McKee placed a camera to watch over him and the other black employees; (2) changes on his time sheets were not recognized; (3) the Defendant attempted to discipline him for doing a practice common among other employees; and (4) he was terminated.  The Plaintiff asserts that all of these allegedly retaliatory actions took place after May, 2001.

**A.  Camera To Watch Over Him And The Other Black Employees**

The Defendant relies on <u>Davis v. Town of Lake Park, Florida</u>, 245 F.3d 1232 (11th Cir. 2001) to assert that being monitored by cameras does not constitute an "adverse employment action."  In <u>Davis</u>, the Eleventh Circuit established a standard for determining whether an employment action is adverse.  The Court held that to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment.  245 F.3d t 1239.  Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances. <u>Id</u>.

In the present case, Plaintiff cannot demonstrate that the use of security cameras in the print shop cause a serious and material change in the terms and conditions of his

employment.  The Defendant has provided undisputed evidence that, since 1997, when the building that houses the print shop and distribution center was built, the security cameras inside that facility have been operational and in the same location.  (McKee Decl. ¶ 5).  The Defendant assets that its cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).  Since the six-color press is highly sensitive and susceptible to thousands of dollars of damage, it is important that the area around that press be monitored and that only persons assigned to that press be in that area. (McKee Decl. ¶ 5). The Defendant contends that cameras were needed because of the cost and sophistication of that particular press.  (McKee Decl. ¶ 5).  In addition, a secondary set of monitors was installed in McKee's office as the result of his discovery of widespread time clock abuse in December, 2001. (McKee Decl. ¶ 6).  The Plaintiff has not provided evidence to establish that these security cameras caused some serious and material change in the terms, conditions, or privileges of his employment.

Furthermore, the Plaintiff can neither establish a causal connection between the installation of the cameras and/or monitors and his complaints of discrimination nor demonstrate pretext.  It is undisputed that the security cameras were put in place when the building was built in 1997.  It is also undisputed that the camera  monitors placed in McKee's office were installed in December, 2001.  The Defendant asserts that the temporal proximity between Smith's May, 2001, complaint or his most recent complaint in September, 2001, and the installation of the monitors in December, 2001, ( a three to seven month period) strongly suggests that there is no connection between the two events.  The Defendant

relies on case law holding that a three and a half month period between protected activity and termination did not, standing alone, show pretext. Wasura v. City of South Miami, 257 F.3d 1238, 1245 (11th Cir. 2001). Notwithstanding, the general case law in the Eleventh Circuit establishes that for purposes of a prima facie case, close temporal proximity may be sufficient to show that the protected activity and the adverse action were not wholly unrelated. Gupta, 212 F.3d at 590.

It is apparent that there is no close temporal proximity between the installation of the cameras in 1997 and the Plaintiff's protected activity. Assuming that the Plaintiff has established close temporal proximity as to the camera monitors in McKee's office, the Defendant has proffered legitimate, nondiscriminatory, and nonretaliatory reasons for the security cameras. The Defendant has provided evidence that the monitors were installed to monitor time clock abuse by several employees and for security purposes. The Plaintiff has not provided evidence to establish that the Defendant's proffered nondiscriminatory and nonretaliatory reasons for its employment decisions were pretextual and that the real reasons behind their actions were retaliatory.

**B.  "Attempted" discipline for doing a practice common among employees.**

Plaintiff asserts that McKee "attempted" to discipline him when McKee discovered his time clock fraud. During the same meeting between McKee and Plaintiff, the Plaintiff asserts that McKee terminated Plaintiff and he was sent home. (Smith Dep., p. 238). The Defendant provided evidence that Plaintiff's pay was not docked, nor was he demoted. (Wells Decl. ¶ 3). After it had been explained to Plaintiff that he was not fired, he returned to work the day after the incident. (Smith Dep., p. 238). Furthermore, the undisputed

evidence reflects that the only thing that happened after McKee confirmed that Plaintiff and other employees had been defrauding the time clock was that McKee sent out a memo to all employees confirming the time clock policy and warning that future violations of the policy would not be tolerated.  As a result of the time clock abuse, Plaintiff was never subjected to a demotion, decrease in pay or any disciplinary action.  Plaintiff has not demonstrated that McKee's alleged attempt to discipline Plaintiff resulted in any discipline or any tangible change in the terms or conditions of his employment.

Even assuming, however that Plaintiff has established an adverse employment action and a causal connection between the "attempted discipline" and his previous complaints of discrimination, the Plaintiff cannot establish that the Defendant's legitimate, nondiscriminatory, and nonretaliatory reason is pretext.  It is undisputed that McKee met with Plaintiff and discussed his time clock practices after Plaintiff had been observed clocking out for lunch for only thirty minutes but, in fact, taking far more than thirty minutes for lunch.  (Smith Dep., p.196; McKee Decl. ¶ 19).  In the meeting, Plaintiff admitted engaging in such practice.  (Smith Dep., p. 164). The Defendant asserts that it met with Plaintiff to discuss Plaintiff's observed time clock abuse.  The Plaintiff has failed to present any evidence that shows that the articulated reason for this action was false or a pretext for unlawful retaliation.

## C.  Changes On His Time Sheet Were Not Recognized.

The Court will address the three instances where the Plaintiff  has alleged circumstances dealing with his time sheets.  In September, 2001, Plaintiff complained to Ealy that he felt that he was being further discriminated or retaliated against because his time sheet

had been withheld while other employees' time sheets were being turned in.  (Smith Dep., p. 197-198).  Ealy testified that when she conducted her investigation of the matter she discovered that Plaintiff's time sheets and the time sheets of other employees had been withheld on that occasion because of missed punches.  (Ealy Dep., p. 55).  A missed punch occurs when an employee forgets to clock in or clock out indicating the time of arrival or departure.  When there are missed punches the whole time sheet is thrown off.  (Ealy Dep., p. 55).  The withholding of time sheets is not an adverse employment action that results in a material or serious change in the terms or conditions of the Plaintiff's employment.

In addition, Plaintiff alleges that his pay check did not reflect the hours that he worked.   However, in deposition testimony, the Plaintiff admitted how he completely misunderstood how the pay system worked.  (Smith Dep., p. 226-227).  After Plaintiff acquired a better understanding of the pay system, he acknowledged that other than his sick time being taken away from him when he supposedly worked on his truck, he did not know of any other occasion where his time wasn't properly adjusted.  Id.

Plaintiff also asserts that he was slighted when he was absent from work on one occasion.  Defendant asserts that Plaintiff's pay was deducted because it had been reported by Tucker to Human Resources that Plaintiff had taken the day off to work on his truck and that it was not a sick day.  When Plaintiff went to Human Resources, Ealy indicated that he could not claim a sick day for a day on which he was off on personal business.  (Smith Dep. p. 206-207).  Plaintiff only replied with "Okay."  (Smith Dep. p. 207).  Plaintiff never denied the allegation to Ealy by telling her that he wasn't working on a truck or that he didn't have a truck (Smith Dep., p. 209-210).  However, Plaintiff denies taking a sick day off from work

and then telling people that he took off of work to work on a truck.  (Smith Dep. P. 206).

Furthermore, the Defendant has articulated a legitimate, non-retaliatory reason for deducting Plaintiff's time on this occasion.  The Defendant proffered that Human Resources had been informed that the Plaintiff had reported off on personal business and then tried to have that absence treated as paid sick time.  (Smith Dep., p. 206-208).  Although he had ample opportunity to correct or contest this information, Plaintiff failed to inform Ealy that he did not report off to work on a truck or that there was some misunderstanding of some sort.  Therefore, the Defendant's asserts that it based its decision to deduct hours from the Plaintiff because Human Resources had been informed that the Plaintiff had reported off on personal business.  In addition, the Plaintiff acknowledged  that sick time was taken off of his time sheet based on hearsay that he was absent to work on his truck.  (Smith Dep. P. 206).  The Plaintiff has failed to present any evidence that shows that the articulated reason for the deduction in the Plaintiff's hours was false or a pretext for unlawful retaliation.

The Court finds that Plaintiff has not established that the three situations in which his time sheets were allegedly withheld or adjusted were to retaliate against him for engaging in protected activity.

**D.  Termination**

The Plaintiff alleges that he was terminated in retaliation for his  engaging in protected activity.  After filing this lawsuit, the Plaintiff injured his back on the job.  The Plaintiff alleges that the Defendant used his absence from work due to his back injury as an opportunity available to it to fire him in retaliation for his  engaging in protected activity.  The Defendant asserts that Plaintiff was considered resigned/voluntary quit HealthSouth after he failed to return to work despite having been released to work by two doctors authorized

under workers' compensation to treat him.

The Defendant provided evidence that after first being released by Dr. Chandler, Smith saw Dr. Jones (his requested second opinion doctor) on June 25 and, on that date, Dr. Jones released him to work on July 1, 2002. (Smith Dep., p. 66-67). Upon receiving this information from the physician, Ealy contacted Smith sometime between June 25th and July 1st to discuss his return to work. (Smith Dep., p.52,66-67). Plaintiff then told Ealy that his personal physician (an internist who was not authorized to treat Plaintiff regarding his worker's compensation condition) had advised him that he did not want him to return to work. (Smith Dep., p.54-55). However, his personal physician informed him that if he did return to work, it would have to be under certain work restrictions. Id. Ealy told Smith that he would have to return to work under HealthSouth's terms or not at all. (Smith Dep., p. 55-56). As a follow-up to the conversation, Ealy wrote Smith a letter informing him that he should contact his supervisor no later than July 8 to discuss his job status, and if he didn't by that date, he would be considered to have resigned from his job. (Ealy Dep., p. 50-51; Ealy Dep. Pl. Exhibit 4). The letter did not mention anything about HealthSouth granting Smith's request for a lifting restriction. (Ealy Dep. Pl. Exhibit 4). Although Smith should have returned to work on July 1, 2002, HealthSouth effectively gave Smith seven days of personal leave between July 1st and July 8th to decide whether to return to work and maintain his employment with HealthSouth. Despite the consequences, Smith failed to comply with Ms. Ealy's request; he did not return to work, contact his supervisor, human resources, or anyone else in management at HealthSouth. In deposition testimony Smith admits that, upon receiving the July 1, 2002, letter from Ms. Ealy, he clearly understood that if he did not return to work or contact HealthSouth by July 8, 2002, he would be considered to have

resigned from his job.  (Smith Dep., p. 58).  Since Smith did not return to work nor contact HealthSouth as instructed, he was considered to have resigned his employment with HealthSouth on July 8, 2002. <u>Id</u>.

It is undisputed that termination is an adverse employment action.  It is also undisputed that the Plaintiff ceased to be an employee at HealthSouth several months after engaging in protected activity.  Even assuming that the Plaintiff was terminated and did not resign from his position at HealthSouth, the Plaintiff has failed to demonstrate sufficient evidence that the articulated nondiscriminatory reason proffered by the Defendant is false or a pretext for unlawful retaliation.  As noted above, the Defendant's preferred reason is that Plaintiff was considered resigned/voluntary quit HealthSouth after he failed to return to work despite having been released to work by two doctors authorized under worker's compensation to treat him.

The Plaintiff alleges that the Defendant's reasons are pretextual because (1) the Plaintiff was still on leave according to his doctor and (2) HealthSouth refused to consider any restrictions which would have allowed the Plaintiff to come back to his job.  It is undisputed that Plaintiff's personal physician who prohibited his return to work without lifting restrictions was not authorized to treat him for his workers' compensation injury.  Dr. Chandler, who was the first doctor assigned to evaluate and treat Plaintiff 's workers' compensation injury,  released Plaintiff  to go back to work with no restrictions on April 24, 2002. (Smith Dep. Def. Exhibit 2).  Nevertheless, Plaintiff then requested a panel of doctors for the purpose of obtaining a second opinion.  HealthSouth granted the request and  Plaintiff  selected Dr. Martin Jones.  (Smith Dep., p. 49-50).  Dr. Jones evaluated Plaintiff, but he did not provide any treatment.  <u>Id</u>.  Dr. Jones released Plaintiff on June 25, 2002 to return to

22

work by July 1, 2002. (Smith Dep., p. 49-50; Ealy Dep., p. 56). Hence, the Plaintiff was no longer on medical leave according to the two doctors authorized to evaluate Plaintiff's workers' compensation injury. Furthermore, after Ealy contacted Plaintiff by telephone and correspondence regarding his return to work, HealthSouth granted Plaintiff a seven day extension from July 1st to July 8th to contact his supervisor (or someone else at HealthSouth) to discuss his return. In deposition testimony Smith admits that, upon receiving the July 1, 2002 letter from Ms. Ealy, he clearly understood that if he did not return to work or contact HealthSouth by July 8, 2002, he would be considered to have resigned from his job. (Smith Dep., p. 58). Although the letter sent to Plaintiff by Ealy did not mention the lifting restrictions as recommended by Plaintiff's personal physician who was not authorized to evaluate Plaintiff's workers' compensation claim, Plaintiff did not contact his supervisor, human resources, or anyone else in management at HealthSouth to further discuss the lifting restrictions or his job status. Plaintiff's failure to contact his supervisor, human resources, or anyone else in management at HealthSouth, and his understanding that if he failed to make such contact he would be considered to have resigned from his job, are major flaws in Plaintiff's claim. The Court finds that the Plaintiff has failed to present any evidence that demonstrates that the Defendant's articulated reasons are false or a pretext for unlawful retaliation.

### C.  Hostile Work Environment

The Plaintiff alleges that the Defendant subjected him to a racially hostile work environment. (Complaint and Amended Complaint ¶ 29). The Defendant asserts that the Plaintiff has failed to present substantial evidence to support a racially hostile work environment claim. A plaintiff alleging a Title VII racially hostile work environment claim

23

must establish the following elements: (1) the employee must belong to a protected group; (2) the employee must have been subjected to racial harassment; (3) the harassment must have been based on the race of the employee; (4) the harassment must have been sufficiently severe or pervasive to alter the terms and conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment, either directly or indirectly. <u>Miller v. Kenworth of Dothan, Inc.</u>, 277 F.3d 1269 (11th Cir. 2002); <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238 (11th Cir. 1999)(applying these factors in the context of a hostile environment sexual harassment claim).

To be actionable under Title VII, the requirement that harassment must be sufficiently severe or pervasive to alter the terms or conditions of employment contains both an objective and a subjective component. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  Hence, the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive. (<u>Id</u>.)   In evaluating the objective severity of the harassment, the Eleventh Circuit has considered, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  <u>Miller</u>, 277 F.3d at 1276 (citing <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997)).

The Plaintiff belongs to a protected class; he is African-American**.**  The Plaintiff has stated in deposition testimony that he was subjected to a racially hostile work environment because (1) he was subjected to unwelcome racial comments by Jim McCravey and Harvey Greene; (2) he was denied promotions; (3) he experienced disparate treatment in overtime

and sick time; (4) he observed that a black temporary secretary's duties had been reduced; (5) he was monitored on camera; (6) his time sheets were messed with; and (7) he was "called to the carpet" for a procedure that everyone else was involved in and, when he pointed this out, no one was disciplined.

## A. **Denial of Promotion.**

Plaintiff is not pursuing a claim for promotion discrimination.  However, he alleges that he was denied promotion(s) constituting racial harassment.  Plaintiff alleges that the only promotion he was denied was when  Mark Tucker was promoted on March 1, 2000, to production supervisor.  (Smith Dep., p. 149-150).  The Defendant provided evidence that Plaintiff was not qualified for the position.   Through deposition testimony, Plaintiff acknowledged that he only worked post-press jobs at HealthSouth and his previous employers.  Therefore, he lacked any pre-press experience.  (Smith Dep., p. 104-125; Smith Dep., Def. Exhibit 4).  In contrast, Tucker had significant pre-press experience in addition to press and post-press experience.  In fact, prior to working at HealthSouth, he ran his own printing company and worked for his family's newspaper. (McKee Decl. ¶22).  Furthermore, Tucker had been performing the duties of supervisor prior to being promoted and he had more seniority in the print shop than Plaintiff. (Smith Dep., p. 174).   The Plaintiff acknowledged in deposition testimony that other than the fact that Tucker is white and he is black, he does not have any other evidence to suggest or indicate that race was a factor in the decision to promote Tucker.  (Smith Dep., p. 154).  The Court finds that Plaintiff has not demonstrated that he was denied promotion(s) based on race.

## B. **Jokes By McCravy and Greene.**

Plaintiff alleges that he heard black jokes from McCravy and Greene resulting in a

25

racially hostile work environment.  Although Plaintiff states that he was subjected to racially insensitive comments, he acknowledges that he can't recall anything at all regarding the comments, including the actual comments made by McCravy and Greene. (Smith Dep., 251-255).  Plaintiff asserts that Greene "talked about black folks in general" all day long. Taking the facts in the light most favorable to the Plaintiff, the Court finds that the Plaintiff has satisfied the third element of the prima facie case of hostile work environment that the harassment was based on race.  Notwithstanding, the Plaintiff has failed to establish that he suffered a racially hostile work environment sufficiently severe or pervasive to alter the terms or conditions of his employment.  Furthermore, the fact that Plaintiff can't recall anything at all regarding the alleged comments, including the actual comments, and he can't demonstrate  the severity of the conduct, whether the conduct was physically threatening or humiliating, or whether the comments interfered with the Plaintiff's job performance are major flaws in the Plaintiff's establishing the severity and pervasiveness of the alleged hostile work environment as it relates to unwelcome comments/jokes by McCravy and Greene.

## C.  Observed That A Black Temporary Secretary's Duties Had Been Reduced.

The Plaintiff alleges that a black temporary secretary had been discriminated against subjecting Plaintiff to a racially hostile work environment.  The Plaintiff alleges that the black temporary secretary had been discriminated against because her duties had been reduced.  As noted above, to prove a racially hostile work environment claim(1) the employee must belong to a protected group; (2) the employee must have been subjected to racial harassment; (3) the harassment must have been based on the race of the employee; (4) the harassment must have been sufficiently severe or pervasive to alter the terms and

26

conditions of employment; and (5) there must be a basis for holding the employer liable for the harassment, either directly or indirectly.  The Plaintiff has not demonstrated how he was subjected to racial harassment based on the alleged harassment of another employee. Furthermore, the Plaintiff has not demonstrated how the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment.  In addition, the Defendant has provided evidence that the secretary's duties were limited because she had performed unprofessionally.  (McKee Decl. ¶ 18; Ealy Dep., p. 31-32).  The  Court finds that the Plaintiff has not demonstrated that the secretary's duties were limited because of her race, subjecting Plaintiff to an allegedly hostile work environment.

**D.  <u>Not Given Same Opportunity To Work Overtime As White Employee.</u>**

The Plaintiff alleges that he was denied the same opportunity to work overtime as white employees.  He complained to Ealy that Kirkland and McKee had not scheduled him to work overtime on a Saturday when the annual report was being generated, while other employees who were white were allowed to do so.  The Defendant asserts that there was a misunderstanding between Kirkland and the Plaintiff and that the Plaintiff was offered the opportunity to work.  Even assuming that the Court finds that the Plaintiff was not allowed to work overtime based on his race, the Plaintiff has failed to establish that he suffered a racially hostile work environment sufficiently severe or pervasive to alter the terms or conditions of his employment.  Upon review of the record, it appears that the Plaintiff was not denied any future overtime opportunities because there were none available. The Plaintiff's one missed opportunity to work overtime does not rise to the level of severe and pervasive conduct necessary to establish a claim of a racially hostile work environment.  The Plaintiff has not established that the alleged conduct was frequent or severe discriminatory

conduct or that it interfered with the Plaintiff's job performance.

**E.   Was "Slighted" If He Ever Took Sick Time.**

Plaintiff alleges that he was slighted if he ever took sick time.  However, Plaintiff does not provide detail as to what he means to allege in this statement.  Therefore, the Court will address two instances where the Plaintiff  has alleged circumstances dealing with sick time.

Plaintiff complained to Ealy that black employees who were sick would not be spoken to by their supervisor upon their return to work.   The Defendant has provided evidence that the Defendant assisted the Plaintiff when he was out sick with his ankle injury.  (Ealy Dep., p. 32).  Even if the Court finds that the Plaintiff has established that the alleged conduct was based on race, the Plaintiff has not provided evidence to demonstrate that the conduct was frequent or severe discriminatory conduct or interfered with the Plaintiff's job performance.

Plaintiff also asserts that he was slighted when he was absent from work on one occasion.  Defendant asserts that Plaintiff's pay was deducted because it had been reported by Tucker to Human Resources that Plaintiff  had taken the day off to work on his truck and that it was not a sick day.  When Plaintiff went to Human Resources, Ealy indicated that he could not claim a sick day for a day on which he was off on personal business.  (Smith Dep. p. 206-207).  Plaintiff only replied, "Okay." (Smith Dep. p. 207).  Plaintiff never denied the allegation to Ealy by telling her that he wasn't working on a truck or he didn't have a truck (Smith Dep., p. 209-210).  However, Plaintiff denies taking a sick day off from work and then telling people that he took off of work to work on a truck.  (Smith Dep. P. 206).  The Court finds that the Plaintiff has not provided sufficient evidence to establish that he was

denied allocating an absence from work as a sick day versus a personal day based on his race. The Court has reached this decision because the Plaintiff acknowledges that sick time was taken off of his time sheet based on hearsay that he was absent to work on his truck. (Smith Dep. P. 206). Further, the record shows that the Plaintiff failed to rebut the allegation to Ealy that he was absent on personal business instead of due to illness.

**F.  Was Watched On A Camera Along With Other Black Employees/His Clocking In and Out Were Monitored.**

The Plaintiff alleges that he was watched on a camera along with other black employees, resulting in a racially hostile work environment.   The Defendant has provided undisputed evidence that, since 1997, when the building that houses the print shop and distribution center was built, the security cameras inside that facility have been operational and in the same location.  (McKee Decl. ¶ 5).   The Defendant alleges that its cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).   Since the six-color press is highly sensitive and susceptible to thousands of dollars of damage, it is important that the area around that press be monitored and that only persons assigned to that press be in that area.  (McKee Decl. ¶ 5). The Defendant contends that cameras were needed because of the cost and sophistication of that particular press. (McKee Decl. ¶ 5).

In or around December, 2001, McKee had a monitor placed in his office that was connected to the security cameras.  (McKee Decl. ¶ 6).  This monitor shows the same camera views that are shown in the security office.  (McKee Decl. ¶ 6).  The Defendant contends that the monitor was connected for several reasons.  (McKee Decl. ¶ 6).  One reason was because

29

of the recently discovered problems with print shop employees, including Plaintiff, improperly checking in and out for work and lunch breaks. (McKee Decl. ¶ 6). One camera showed a view of the time clock and McKee was able to check employees as they clocked in and out. (McKee Decl. ¶ 6). Another reason McKee monitored the monitors was to observe the six color press. (McKee Decl. ¶ 6). As noted above, the six-color press was extremely expensive and a highly sensitive press and needed to be able to be observed at any time. (McKee Decl. ¶ 6). In addition, around this time the amount of business being handled by the print shop and distribution center was increasing, leading to an increase in the number of outside truckers coming in and out of the distribution center. (McKee Decl. ¶ 6). McKee was concerned, for security reasons, with observing the areas of the distribution center where the outside truckers would enter and exit the building. (McKee Decl. ¶ 6). The Defendant contends that none of these cameras have ever been located to monitor a particular employee or group of employees. (McKee Decl. ¶ 6). Upon review of the record, the Court finds that the Plaintiff has not provided any evidence to establish that the cameras were arranged and monitored to discriminate against the Plaintiff on account of his race. Even assuming that the Plaintiff has established such element of the prima facie case, Plaintiff can not demonstrate that the alleged harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment

## G.  His Time Sheets Were "Messed With."

Plaintiff alleges that his time sheets were "messed with." The Court will address the two[12] instances where the Plaintiff has alleged circumstances dealing with his time

_____

[12] To the extent that Plaintiff claims he was improperly docked for several hours because human resources was informed that he was absent from work to work on his truck, Plaintiff has not provided sufficient evidence to establish that he was docked based on his race. As discussed

sheets.  In September, 2001, Plaintiff complained to Ealy that he felt that he was being further discriminated or retaliated against because his time sheet had been withheld while other employees' time sheets were being turned in.  (Smith Dep., p. 197-198).  Ealy testified that when she conducted her investigation of the matter she discovered that Plaintiff's time sheets and the time sheets of other employees had been withheld on that occasion because of missed punches.  (Ealy Dep., p. 55).

Plaintiff also alleged that his pay check did not reflect the hours that he worked. However, in deposition testimony, the Plaintiff admitted how he completely misunderstood how the pay system worked.  (Smith Dep., p. 226-227).  After Plaintiff acquired a better understanding of the pay system, he acknowledged that other than his sick time being taken away from him when he supposedly worked on his truck, he did not know of any other occasion where his time wasn't properly adjusted.  Id.  The Court finds that Plaintiff has not established that the two situations in which his time sheets were allegedly withheld or adjusted were because of his race.

## H. "Called To The Carpet" For A Procedure That Everyone Else Was Involved In And When He Pointed This Out, No One Was Disciplined.

Plaintiff alleges that he was subjected to a racially hostile work environment when he was questioned by McKee regarding his time sheets and clocking in and out procedures. The Defendant provided evidence that Plaintiff was observed clocking out for lunch for thirty minutes but taking a longer lunch break than thirty minutes.  Defendant met with Plaintiff

---

under Section IVB(C), Plaintiff acknowledges that an absence was recorded as a personal day and not a sick day because of hearsay that he had taken the day off to work on his truck.  When Plaintiff met with Ealy to discuss the recording of his absence, he neither denied the allegation nor denied he had a truck.  Plaintiff has not presented substantial evidence to support a racially hostile work environment claim.

to discuss his time clock abuse.  In the meeting, Plaintiff admitted defrauding the clock and he informed McKee that other employees were also engaged in such conduct.  After McKee conducted further investigations, he issued a memo to all employees reiterating the policy on time recording and warning of the consequences of any future violations of that policy. (McKee Dep., p. 79).  No disciplinary action was taken against the Plaintiff.  The Court finds that the Plaintiff has not provided any evidence to demonstrate that he was questioned regarding his time clock abuse because of his race or that such event altered the terms and conditions of his employment.

### V. Conclusion

For the reasons set forth above, the Court grants the Defendant's motion for summary judgment as to Plaintiff's discrimination and retaliation claims.

**DONE** and **ORDERED** this 25th day of March, 2005.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**