FILED

2005 Mar-25  PM 04:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **DERRICK THOMAS, TIM AVERY<br>KEDRIC HOOKS, ROBERT SMITH,<br>and ROBERT VASSER,** ] | |
| **PLAINTIFFS,** ] | |
| **v.** ] | **Case No.  CV-02-VEH-0565-S** |
| **HEALTHSOUTH CORPORATION** ] | |
| **DEFENDANT.** ] | |

**<u>MEMORANDUM OF DECISION</u>**

This Court has before it the August 4, 2003 motion of Defendant HealthSouth Corporation

for summary judgment as to Plaintiff Derrick Thomas' claims.  (Doc. 22)

**I.  Procedural History**

Plaintiffs Derrick Thomas, Robert Vasser, Tim Avery, Robert Smith and Kedric Hooks

commenced this action on March 4, 2002, by filing a complaint in this Court alleging separate

and individual  violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e et seq., the Civil Rights Act of 1991, and 42 U.S.C. § 1981.[1]   On August 1, 2002,

Plaintiffs filed a Motion to Amend Complaint which was granted on August 5, 2002.  Plaintiff

Thomas contends that, throughout his employment, Defendant subjected him to both a racially

hostile work environment and disparate pay race discrimination by paying him less than similarly

situated white employees.  Plaintiff asserts that he was constructively discharged on August 17,

---

[1] The claims of Plaintiff Kedric Hooks (deceased) were dismissed by this Court on April 17, 2003.  The claims of the three other remaining Plaintiffs (Vasser, Avery, and Smith) are the subject of separate pending summary judgment motions filed contemporaneously with the summary judgment motion regarding Plaintiff Thomas.

1

2001.  Plaintiff also alleges in his complaint that he was denied promotions and such positions were usually given to less senior and less qualified white employees, constituting disparate treatment race discrimination in promotions.[2]  In addition, Plaintiff contends that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and retaliation; however, no corrective action was taken by the Defendant and he was further subjected to retaliation.  The Plaintiff asserts that the Defendant has a pattern and practice of race discrimination.

On August 4, 2003, the Defendant filed a motion for summary judgment asserting: (1) that Plaintiff has failed to make a prima facie case of disparate pay race discrimination, race discrimination in promotions, and retaliation;  (2) that even if Plaintiff has established a prima facie case as to  his discrimination and retaliation claims, Plaintiff has failed to rebut the Defendant's legitimate, non-discriminatory, and non-retaliatory reasons for its employment decisions; (3) that Plaintiff has failed to establish the essential elements of a racially hostile work environment claim by providing evidence that he was subjected to severe or pervasive racial harassment that altered the terms or conditions of his employment; (4) that Plaintiff has failed to establish a claim of constructive discharge; and (5) that Plaintiff has failed to establish by substantial evidence  a pattern or practice of race discrimination claim.

The Defendant has submitted evidence[3]  in support of its motion for summary

---

[2] Plaintiff asserts in his brief in response to Defendant's motion for summary judgment that he is not pursuing a claim for discrimination in promotions.  Therefore, that claim has been abandoned.

[3] The Defendant submitted the depositions of Plaintiff Robert Vasser, Plaintiff Timothy Avery, Plaintiff Robert Smith, Plaintiff Derrick Thomas, Tricia Ealy, Mike McKee, a declaration by Tricia Ealy (Wells), and a declaration by Mike McKee.  References to the deposition transcripts are denoted by the last name of the deponent, followed by the abbreviation "Dep.,"

judgment and filed a supporting brief on August 4, 2003.  On September 5, 2003, the Plaintiff filed a brief in response to the Defendant's motion for summary judgment.  The Plaintiff did not file evidence in opposition to Defendant's motion for summary judgment.  The Defendant filed a reply brief on September 26, 2003.

## II.  Standard of Review

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir.

---

followed by the page number or the deposition exhibit being referenced.

1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  Fitzpatrick, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving

4

party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III.  Relevant Facts[4]

Derrick Thomas, the Plaintiff, was hired by HealthSouth in March, 1999, as a mail and inventory clerk in the distribution center at a starting salary of $8.42 per hour.  (Thomas Dep., p. 83-89).  At HealthSouth, the position title of mail room and inventory clerk has always included several different positions, such as the mail room clerk position and the distribution center clerk position.  The work performed in the distribution center is entirely different from the work performed in the mail room.  (Thomas Dep., p. 88-89).  The distribution center is essentially a warehouse which handles the storage and distribution of a variety of marketing items, including tee-shirts, caps, printed materials, brochures, magazines, and business forms.  (Thomas Dep., p. 86-87).  Thomas worked as a mail and inventory clerk in the distribution center for several

---

[4] Facts are undisputed unless otherwise expressly noted.

months.[5]  (Thomas Dep., p. 89).

After briefly working in the distribution center, Thomas was transferred to work in the print shop as a bindery helper.  (Thomas Dep., p. 89).  He was assigned to assist Cathy Kelley who was the bindery operator.  (Thomas Dep., p. 92-93).  In the print shop, Thomas's immediate supervisor was Danny Kirkland.  (Thomas Dep., p. 106).  The print shop is divided into three separate areas/functions --- pre-press, press, and post-press operations.  (Thomas Dep., p.107).  Pre-press operations consist of computerized graphics and layout work that is done prior to printing. (Thomas Dep., 108).  The press operations consist of the actual printing of the magazine or paperwork.  (Thomas Dep., 108).  The post-press operations are where the printed material is cut, folded, and bound into a magazine, brochure, pre-printed business form, or other material.  (Thomas Dep., p. 109).  Thomas worked as a bindery helper for approximately one year.  (Thomas Dep., 94).

In November, 1999, Thomas became aware of a vacancy in the press person level one/press helper job.[6]  (Thomas Dep., 104).  Thomas informed his supervisors, Mike McKee and Danny Kirkland, that he was interested in the vacant position.  (Thomas Dep., p. 115; 124).  His supervisors informed him that the position was a lateral move and paid a lower salary than what

---

[5] Plaintiff testified in his deposition that he worked in the distribution center for approximately four to six months.

[6] The Defendant asserts in deposition testimony and declarations that the vacant position was a post-press packaging clerk position.  The Plaintiff asserts in deposition testimony that the vacant position was a press helper position.  Hence, there are several disputes between the parties as to the type of position that became vacant in November, 1999, and as to what transpired when Thomas expressed his interest in the position.  As is our obligation at the summary judgment stage, we will resolve all disputes in favor of Plaintiff's version of events.

Thomas was making as a bindery helper.[7] (Thomas Dep., p. 118). In January, 2000, Jared Williams, a white male, was hired by HealthSouth to fill the vacant position and Thomas was not offered the position. (Thomas Dep., 116; McKee Declaration ¶ 16).

In or about August, 2000, the press helper job became available. (Thomas Dep., p. 94). McKee offered the position to Thomas and he began working in that job on a "trial basis." (Thomas Dep., p. 102, 124-125). Thomas was finally promoted to the press helper position in December 2000. (Thomas Dep., p. 94) At that time, Thomas also received a raise to $10.37 per hour and he was paid retroactively in the amount of $218.15 for the full time he had worked in the press helper position. (Thomas Dep., p. 102-104.)

Throughout Thomas'entire employment, HealthSouth has had in place an equal employment policy, an anti-harassment policy, and a complaint procedure. (Thomas Dep., p. 139-140, 142.) In May of 2001, approximately five or six months after he was promoted to the press helper position, Thomas utilized HealthSouth's complaint procedure and met with Tricia Ealy, Director of Human Resources, to discuss his concerns regarding discrimination and retaliation at HealthSouth. (Thomas Dep., p. 137-138). This May, 2001, visit to Human Resources was the only occasion when Thomas ever raised any complaints or concerns of discrimination, harassment, retaliation, or unfair treatment at HealthSouth. (Thomas Dep., p. 143.)

Thomas and Robert Smith (another plaintiff in this case) contacted Ealy and met with her at the Human Resources Department at the corporate office. (Thomas Dep., p. 146). The concerns or problems raised by Thomas to Ealy were (1) Williams getting hired into a press

---

[7] Thomas was making approximately $9.02 per hour as a bindery helper on the day shift. The vacant position had a starting salary of $8.75 per hour and was a night shift position.

helper job in January, 2000, (2) Thomas being told not to talk to an outside Heidelberg consultant, (3) an African American temporary secretary being limited in her work assignments to only answering the telephone, (4) a comment by his supervisor, Mr. Kirkland, that Thomas was "always ready to go" (meaning that Thomas was always ready to leave work to go home), (5) a delay in Thomas getting his pay increase for the press helper promotion, and (6) that Kirkland and McKee would speak to some employees (the white employees) but not to others (the black employees). (Thomas Dep., p. 147-148, 150-153, 157-158). These complaints were the only complaints ever made by Thomas regarding any concerns he had working in the print shop at HealthSouth. (Thomas Dep., p.159-160, 165).

Ealy told Thomas that she would look into his complaints and follow-up with Thomas regarding her findings. (Thomas Dep., p. 160). Within a week, Ealy met with Thomas regarding her investigation of his complaints. (Thomas Dep., p. 160-161). In this follow-up meeting, Ealy explained to Thomas that Kirkland was sorry for saying that Thomas was "always ready to go," and that he had just been frustrated with Thomas always wanting to leave work as soon as possible. (Thomas Dep., p. 162-163). Ealy told Thomas that Kirkland agreed that he should not have made the comment in front of other employees and that Kirkland apologized for the comment. (Thomas Dep., p.. 162-163). With regard to Williams being hired, Ealy informed Thomas that she had talked to Kirkland and McKee and that they had understood that Thomas was not interested in that vacancy because it was a lateral move on the night shift that would not result in any increase in pay. (Thomas Dep., p. 164).

Ealy further informed Thomas and Smith that everyone at HealthSouth would be treated fairly and that she and Jack Hawkins (McKee's supervisor) would stay involved and monitor the

situation.  (Thomas Dep., p. 171).  Ealy also told Thomas that McKee and Kirkland would follow-up with him to discuss these issues.  (Thomas Dep., p. 171).  McKee and Kirkland met with Thomas that same day (May 18, 2001).  (Thomas Dep., p. 171-172).

In the May 18 meeting with Kirkland and McKee, Thomas expressed his dissatisfaction with a previous discussion he had with the two supervisors pertaining to the requirements and job responsibilities of the press helper job.  (Thomas Dep., p. 175).  Specifically, when McKee approached Thomas about the press helper promotion in approximately August, 2000, he and Kirkland emphasized the importance of the job, the importance of performing the job correctly, and the problems that would arise if the job were not performed correctly.  (Thomas Dep., p. 174-175).  Thomas expressed that he thought they were trying to discourage him from taking the job and the discussion hurt his feelings.  (Thomas Dep., p. 176-178).  McKee and Kirkland further explained to Thomas that the only reason they discussed these aspects of  the press helper job with  him was because they wanted him to understand that he had to be on this job at all times when the machine was running.  (Thomas Dep., p. 180-181).  At this meeting, Kirkland also apologized to Thomas for saying that he was "always ready to go," and said that he made the comment out of frustration and should not have said it.  (Thomas Dep., p. 181).  Since Thomas had to depart the meeting early for his daughter's graduation, McKee arranged for a follow-up meeting on Monday, May 21, 2001 to address any other issues.  (Thomas Dep., p. 182).  On that Monday, Thomas informed McKee that he did not want to meet again and he did not have anything else he needed to discuss further.  (Thomas Dep., p. 182-183, 190).  In the three months that Thomas continued to work at HealthSouth, he did not return to McKee to discuss any further problems or issues.  (Thomas Dep., p. 199-200.)  Similarly, Thomas never returned to Kirkland

9

or Ealy and never spoke to anyone else in HealthSouth management to address any subsequent

issues, concerns, or complaints.  (Thomas Dep., p. 199-200.)  After raising these concerns and

issues in May, 2001, Thomas was not fired, suspended, disciplined, written up, demoted, moved

to a different job, and/or he did not suffer any reduction in his salary.[8]  (Thomas Dep., p. 200,

216.)

### Security Cameras

After the May of 2001 meeting with Ms. Ealy, Kirkland, and McKee, Thomas noticed

while in McKee's office that there was a security monitor in his office that displayed a view of

the production floor of the print shop and areas of the distribution center.  (McKee Decl. ¶ 5;

Thomas Dep., p. 232).  The security cameras inside the print shop and distribution center have

been operational and in the same location since the construction of the facility that houses both

the print shop and distribution center.  (Thomas Dep., p. 231, 238; McKee Decl. ¶ 5).  After a new

six color press was purchased, HealthSouth positioned a camera to focus on that press.[9]  (McKee

Decl. ¶ 5).  McKee had a monitor placed in his office that was connected to the original security

---

[8] Thomas alleges that "after he made his complaints known he was told by McKee that he was not allowed to touch certain buttons on the Heidelberg machine, even though he was a helper on the machine."  (Plaintiff's brief p. 3).  In addition, Thomas contends that he was forced to perform additional tasks when work was slow, while white employees were allowed to do nothing.  (Thomas Dep., p. 201).  Plaintiff further alleges that after meeting with Ealy, Kirkland and McKee, McKee told Plaintiff that "things were going to get tough" and that McKee was "going to have to straighten it out."  (Thomas Dep., p. 202).

[9] Thomas contends that the security cameras were pointed specifically in the areas where the black employees worked, allowing McKee to only monitor them, resulting in a hostile environment and retaliation based on race.  (Thomas Dep., p. 232).  The Defendant contends that the cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).  In addition, the Defendant alleges that a camera was pointed at the catwalk over the six color press to monitor any unauthorized personnel in that area.  (McKee Decl. ¶ 5).

cameras.[10] (McKee Decl. ¶ 6).  This monitor shows the same camera views that are shown in the security office.  (McKee Decl. ¶ 6).

Thomas resigned his employment at HealthSouth in mid-August 2001, providing two weeks' note.  (Thomas Dep., p. 64-65).  McKee asked him to delay his decision and tried to talk Thomas out of resigning.  (Thomas Dep., p. 229-230).  McKee asked Thomas to think about his decision over the weekend and to reconsider his resignation.  (Thomas Dep., p. 280).  On the following Monday, Thomas informed McKee that he had decided to resign.  (Thomas Dep., p. 280).  HealthSouth accepted Thomas's resignation and paid him for the remaining two weeks. (Thomas Dep., p. 65).  Thomas left HealthSouth to work at Birmingham Printing making $11.20 per hour, almost $1.00 more than he was making at HealthSouth.  (Thomas Dep., p. 66).  At Birmingham Printing, Thomas works as a full-time assistant pressman or press helper.  (Thomas Dep., p. 67-68).

## IV. Applicable Substantive Law and Analysis

Plaintiff claims race-based disparate treatment in compensation and retaliation under Title VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security

---

[10] The Defendant testified that the security cameras were placed in McKee's office on or about December, 2001.  The Plaintiff testified that he witnessed the security cameras in McKee's office monitoring the black employees and questioned McKee about the cameras.  However, the Plaintiff testified that he resigned in mid-August, 2001.  Hence, based on the Plaintiff's testimony he resigned before December, 2001, the date the Defendant testified the cameras were placed in McKee's office.  As is our obligation at the summary judgment stage, we will resolve all disputes in favor of Plaintiff's version of events for determining the Defendant's motion for summary judgment as to Plaintiff Thomas' claims.  Therefore, we will assume that the cameras were installed in McKee's office after the May, 2001, meeting and prior to the Plaintiff's resignation.

of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[11]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  See Chapman, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  See Standard, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  See Combs v. Plantation Patterns, 106 F.3d 1519, 1537 (11th Cir. 1997); Grigsby v. Reynolds Metals Co., 821 F.2d 590, 595 (11th Cir. 1987).  Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption."  Burns v. Gadsden State Community College, 908 F.2d 1512 (11th Cir. 1990).  Cf. Wright v. Southland Corp., 187 F.3d 1287, 1293-94 (11th Cir. 1999)

---

[11]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  See Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

(per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

"In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." <u>Combs</u>, 106 F.3d at 1527. Under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. <u>See id.</u> at 1527-28. The methods of presenting a prima facie case, as well as the exact elements of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation. <u>See, e.g.</u>, <u>Nix v. WLCY Radio/Rahall Communications</u>, 738 F.2d 1181, 1185 (11th Cir. 1984); <u>Lincoln v. Board of Regents of Univ. Sys.</u>, 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[12] <u>See</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 (hiring); <u>Holifield v. Reno</u>, 115

---

[12]<u>See also</u> <u>McDonnell Douglas</u>, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at 1185 (discipline);

Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071, 1074 (5th Cir. 1981)

(wages).

Once the plaintiff has shown a prima facie case and, thereby, has created the

presumption of discrimination, the burden of production shifts to the employer to articulate

a legitimate, nondiscriminatory reason for its actions.[13]  See Combs, 106 F.3d at 1528.  The

employer "need not persuade the court that it was actually motivated by the proffered

reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer

satisfies that burden by articulating one or more such reasons, then the presumption of

discrimination drops out of the case and the burden of production again shifts to the plaintiff

to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly

legitimate reason is merely a pretext for illegal discrimination.[14]  Where the defendant

articulates multiple  reasonable, legitimate, and nondiscriminatory reasons, plaintiff must

rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25. Although

the prima facie case is irrelevant once the employer has offered a legitimate reason for its

actions, the evidence of pretext may include the same evidence offered to establish the prima

facie case.  See Combs, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the

---

[13]See Chapman, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

[14]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." <u>Burdine</u>, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment motion either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion);[15] <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502 (1993); <u>Abel v. Dubberly</u>, 210 F.3d 1334, 1339 (11th Cir. 2000); <u>Alexander v. Fulton County</u>, 207 F.3d 1303, 1336 (11th Cir. 2000); <u>Combs</u>, 106 F.3d at 1529-38 (interpreting <u>Hicks</u> and the post-<u>Hicks</u> case law); <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 920-21 (11th Cir. 1993).

## A.  <u>Discrimination in Compensation</u>

---

[15]The court in <u>Chapman</u> modified the statement in <u>Combs</u> contrary to this holding in <u>Reeves</u> after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law.  <u>See</u> <u>Chapman</u>, 229 F.3d at 1025, n.11.

Defendant argues that it is entitled to summary judgment as to Plaintiff's disparate pay race discrimination claim because (1) Plaintiff cannot provide evidence of a similarly situated employee and has repeatedly changed his claim of an alleged comparator; (2) Plaintiff's claim is untimely; (3) even if the Court finds Plaintiff's claim to be timely, Plaintiff has failed to establish a prima facie case of disparate pay race discrimination; and (4) Plaintiff has failed to rebut the Defendant's legitimate nondiscriminatory reasons for the salary of the alleged comparator.   Plaintiff claims that, throughout his employment, Defendant paid him less than similarly situated white employees, constituting disparate pay race discrimination.  The Court finds that Plaintiff has not established a prima facie case of race-based discrimination in compensation and summary judgment should be granted in favor of the Defendant as to this claim.

In deposition testimony, Plaintiff made allegations that white press person level 1 employees (also referred to as press helpers) were paid more than he based on race. (Thomas Dep. P. 274-276).  He did not identify a specific press helper that received a higher wage than he.  However, the Defendant provided, in its brief for summary judgment, undisputed evidence that Thomas was the highest paid press person level 1 employee in the entire print shop and that he did not have a proper comparator for his discrimination pay claim.  (McKee Decl ¶ 17).  The Plaintiff, in his reply brief to the Defendant's motion for summary judgment,  alleges, for the first time, that Jim McCravey, a distribution center employee, is a proper comparator for his discrimination pay claim.  The Defendant contends that Plaintiff's allegation that McCravey is similarly situated to Plaintiff should be rejected because it is a post-discovery change in his claim.  Further, the Plaintiff did not provide any

evidence to support his allegation.  The Court finds that the Plaintiff was provided an opportunity in deposition to identify specific employees that were similarly situated to Plaintiff but were treated differently than Plaintiff based on race.  The  Plaintiff should not be allowed to identify different alleged comparators post discovery and after the Defendant established by undisputed evidence that the employees proffered by the Defendant in deposition testimony are not proper comparators.  Even if the Court allowed this claim and considered it timely, the Plaintiff has failed to establish a prima facie case of disparate pay discrimination.

Adapting the McDonnell Douglas test to the facts of this case, an employee must establish a prima facie case of intentional discrimination in compensation under Title VII by showing that (1) he belongs to a racial minority; (2) he received low wages; (3) similarly situated comparators outside the protected class received higher compensation; and (4) he was qualified to receive the higher wage.  See Cooper, et. al., v. Southern Company, et. al., 390 F.3d 695, 735 (11th Cir. 2004) (compensation discrimination by race); Daniel v. Church's Chicken, 942 F.Supp. 533, 538 (S.D. Ala 1996); Miranda v. B&B Cash Grocery Store, Inc, 975 F.2d 1518, 1528 (11th Cir. 1992) (compensation discrimination by gender); MacPherson v. Univ. of Montevallo, 922 F.2d 766, 774 (11th Cir. 1991) (compensation discrimination by age).  The comparators must perform jobs similar to the Plaintiff's; thus, the Plaintiff must show that, in his job, he "shared the same type of tasks" as the comparators.  Cooper, et. al., v. Southern Company, et. al., 390 F.3d 695, 735 (11th Cir. 2004), quoting Miranda, 975 F.2d at 1529.

The Defendant argues that Plaintiff cannot  establish a prima facie case because he

fails to show the existence of a similarly situated employee.  Plaintiff alleges that he was paid less than McCravey who was similarly situated to him. The Defendant asserts that McCravey is not similarly situated to the Plaintiff "in all relevant respects" because they did not even work at the distribution center at the same time.[16]  The usual unequal pay case involves two employees, one black and one white, employed at the same time and doing substantially the same work.  In this case, the two employees were employed at different times in the same position.  The analysis is nonetheless the same for both types of cases.  See Pittman, 644 F.2d at 1074.  The Eleventh Circuit has noted in dicta that "in a comparator analysis, the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him."  Cooper, 390 F.3d at 735 (quoting MacPherson, 922 F.2d at 774 n.16)

Plaintiff is a black male.  He was initially employed as a mail and inventory clerk in the distribution center.  McCravey, a white male, was also employed as a mail and inventory clerk in the distribution center.  It is undisputed that McCravey received a higher wage than the Plaintiff.  Once the Plaintiff has shown a prima facie case of disparate pay discrimination, the burden shifts to the Defendant to articulate a legitimate nondiscriminatory reason for its actions.

The Defendant has proffered that McCravey's significant prior work experience warranted paying him a higher salary than Plaintiff.  The undisputed evidence establishes

---

[16] Thomas worked in the distribution center from March 1999 until approximately July or September 1999.  (Thomas Dep., p. 84-89).  McCravey did not begin working at HealthSouth until December 1999, almost three to five months after Thomas last worked in the distribution center.  (Ealy Dep., Ex. 3, p. 5).

that Thomas worked for two years in shipping and receiving at EBSCO and three years working in the mailroom at Cobb Theater. (Thomas Dep., Ex. 1). In contrast, McCravey had approximately 19 years of experience, all of which was in the shipping of printed materials at EBSCO, National Computer Print, Mail Enterprises, High Cotton, and other businesses. A factor such as experience is a legitimate non-discriminatory reason and is often used as a defense to liability in sex-based wage discrimination claims. See Miranda, 975 F.2d at 1533 n. 18.

When the Defendant produces a legitimate non-discriminatory reason for the alleged discrimination, the Plaintiff must prove that the legitimate reason offered was a mere pretext for an illegal motive. McDonnell, 411 U.S. at 802. The Plaintiff has not produced any evidence to demonstrate that Defendant's explanation for the pay disparity was a pretext for race-based discrimination and that the Defendant intentionally discriminated against Plaintiff. Accordingly, the Court finds that Plaintiff has not satisfied its burden in demonstrating race-based discrimination in compensation as it relates to Jim McCravey.

Based on the foregoing reasons, the Court grants the Defendant's motion for summary judgment on the Plaintiff's disparate pay race discrimination claim.

## B.  Pattern and Practice of Race Discrimination

The Plaintiff asserts that the Defendant has a pattern and practice of race discrimination. To establish a pattern or practice of disparate treatment for purposes of a discrimination claim under Title VII, the employee must show by a preponderance of the evidence that intentional discrimination was the employer's standard operating procedure. See Brazemore v. Friday, 478 U.S. 385, 398 (1986). Hence, the Plaintiff must show that

19

intentional discrimination was the Defendant's regular rather than the unusual practice. (Id.)
The plaintiff can prove that discrimination was the standard operating procedure "through
a combination of statistics and anecdotes." Joe's Stone Crab, 220 F.3d at 1274.

Although the Plaintiff alleged in his complaint a pattern and practice of race
discrimination, the Plaintiff has not produced any evidence to establish such claim of
discrimination. "A party responding to summary judgment may not rest on [his] pleadings
to demonstrate the presence of an issue of fact." Miranda, 975 F.2d at 1533. Accordingly,
the Court finds that the Plaintiff has not established that intentional discrimination was the
Defendant's standard operating procedure. Therefore, the Plaintiff's claim fails as a matter
of law.

### C. Hostile Work Environment

The Plaintiff alleges that the Defendant subjected him to a racially hostile work
environment. The Defendant asserts that the Plaintiff doesn't present sufficient evidence to
support a racially hostile work environment claim. A plaintiff alleging a Title VII racially
hostile work environment claim must establish the following elements: (1) the employee
must belong to a protected group; (2) the employee must have been subjected to harassment;
(3) the harassment must have been based on the race of the employee; (4) the harassment
must have been sufficiently severe or pervasive to alter the terms and conditions of
employment; and (5) there must be a basis for holding the employer liable for the
harassment, either directly or indirectly. Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269
(11th Cir. 2002); Mendoza v. Borden, Inc., 195 F.3d 1238 (11th Cir. 1999)(applying these
factors in the context of a hostile environment sexual harassment claim). To be actionable
under Title VII, the requirement that harassment must be sufficiently severe or pervasive to

alter the terms or conditions of employment contains both an objective and a subjective component.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993).  Hence, the behavior must result in both an environment that a reasonable person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive. (Id.)  In evaluating the objective severity of the harassment, the Eleventh Circuit has considered, among other factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Miller, 277 F.3d at 1276 (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997).

The Plaintiff belongs to a protected class; he is African-American.  The Plaintiff has testified in deposition that he was subjected to a racially hostile work environment because: (1)  Plaintiff was not allowed to touch certain buttons on a machine important to his job; (2) Plaintiff was forced to pick up additional duties during slow periods although white employees were allowed to stand around; (3) Plaintiff was told not to talk with a consultant on a machine on which he worked; (4) Plaintiff was threatened by McKee after he complained of race discrimination; (5) Plaintiff was specifically watched on cameras by McKee; (6) Plaintiff was accused of stopping up a commode; (7) Plaintiff was not spoken to by his supervisor McKee; (8) Plaintiff was passed over for promotions; (9) Plaintiff worked in a job without receiving the proper pay; and (10) Plaintiff had to endure his supervisors' attempts to talk him out of a job he wanted.  In addition to demonstrating that he was subjected to harassment, the Plaintiff must show that the harassment was based on his race.

1.      **Buttons on the Six-Color Press**

_____Plaintiff alleges that he was not allowed to touch certain buttons on the six-color press which is important to his job.  The Defendant has provided evidence that the press operator is responsible for the actual set up and operation of the press and determines what additional duties the press helper should perform or be trained to perform.  The press helper normally works the back of the press, loading paper and performing other helper functions as instructed by the press operator.  (McKee Decl. ¶ 7).  The Plaintiff has provided evidence that another press helper was allowed to utilize other buttons on the press helper such as "wash-up" the machine.  The Defendant has provided evidence that at HealthSouth it is not the press helper's job to "push buttons on the machine."  However, the Defendant alleges that it not unusual for a press operator to allow a press helper to push necessary buttons to operate the machine.  The Plaintiff asserts that he was not allowed to utilize other buttons on the machine because McKee instructed the press operator to not allow Plaintiff to "push buttons on the machine."  The Court finds that the Plaintiff has not provided sufficient evidence that he was not allowed to push other buttons such as the wash-up button, on the machine, because of his race.

Even assuming, however, that the Court takes Plaintiff's allegation into consideration and determines that he was subjected to harassment based on his race, Plaintiff has failed to establish that he suffered a racially hostile work environment sufficiently severe or pervasive to alter the terms or conditions of his employment.  Plaintiff does not assert any allegations of frequent or severe discriminatory conduct, physically threatening or humiliating conduct, or any discriminatory conduct that unreasonably interfered with Plaintiff's job performance.

2.      **Additional Duties During Slow Periods**

22

Plaintiff alleges that he was forced to pick up additional duties during slow periods although white employees were allowed to stand around, creating a racially hostile work environment. The Defendant has provided undisputed evidence that the six-color press is the only press at HealthSouth that requires both an operator and a helper. There were two helpers assigned to work on the six-color press. Thomas worked on the day shift and Brian (white) worked on the night shift. Unlike other presses that require only one person to operate it, when the six-color press was not running requiring an operator and a helper, the helpers on such press were assigned other duties or tasks to perform. The Defendant has provided in deposition testimony that both Brian and Thomas were assigned additional work during slow periods. The Plaintiff has not provided any evidence to demonstrate that he was assigned other duties on account of his race.

3.   **Heidelberg Consultant**

The Plaintiff asserts that he was told not to talk with a consultant on a machine on which he worked. The Defendant has provided undisputed evidence that McKee communicated to Plaintiff and to all other non-essential employees that they should not talk to the Heidelberg consultant when he was at HealthSouth working on the presses, and that the only employees who should be talking and working with that consultant were the press operators or others directly involved in the technical problems for which the consultant had been called. The Defendant provided evidence that the sole and only reason for this instruction to Plaintiff and other non-essential employees was the $200 per hour expense of the consultant. Plaintiff admits that he was talking with the Heidelberg consultant about Germany and not about the six-color press. (Thomas Dep., p. 191). Plaintiff acknowledges that he had no knowledge or expertise in the area of the six-color press that the consultant

23

was there to fix.  (Thomas Dep., p. 193).  Further, Plaintiff concedes that McKee said that he didn't want Plaintiff talking to the consultant because the consultant makes too much money for the Plaintiff to be talking to him.  (Thomas Dep., p. 191).  The Court finds that the Plaintiff has not provided any evidence that the Defendant did not want him to talk to the consultant on account of Plaintiff's race.

4.    **Threat By Supervisor McKee After Making Complaint of Race Discrimination**

In deposition testimony, Thomas alleged that in May, 2001, McKee told him that "things were going to get tough," and that McKee "was going to have to straighten it out." (Thomas Dep., p. 202).  McKee denies making this statement but testified that to the extent that he said anything about things changing at HealthSouth any such statement was made to the print shop employees as a group and referred to the fact that management was not going to tolerate any continued violations of HealthSouth's policy such as time clock abuse and excessive personal phone calls.  (McKee Decl. ¶ 23).  Plaintiff admits: (1) that around the time of McKee's alleged threat there had been problems with employees improperly clocking in and out; (2) that a memo was sent to all print shop employees regarding the time clock abuse and the proper time clock procedures that should be followed; and (3) that the policy was applied to all employees in the print shop regardless of race.  (Thomas Dep., 212-213). The Plaintiff has not demonstrated that the alleged statement by McKee was based on race.

5.    **Plaintiff Watched on Cameras by McKee**

The Plaintiff alleges that he was specifically watched on cameras by McKee.  The Defendant has provided undisputed evidence that, since 1997, when the building that houses the print shop and distribution center was built, the security cameras inside that facility have been operational and in the same location.  (McKee Decl. ¶ 5).  The Defendant's cameras

were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building. (McKee Decl. ¶ 5).   The Defendant contends that this was needed because of the cost and sophistication of that particular press.  (McKee Decl. ¶ 5).  Since the six-color press is highly sensitive and susceptible to thousands of dollars of damage, it is important that the area around that press be monitored and that only persons assigned to that press be in that area. (McKee Decl. ¶ 5).

        After May, 2001, McKee had a monitor placed in his office that was connected to the security cameras.  (McKee Decl. ¶ 6).  This monitor shows the same camera views that are shown in the security office.  (McKee Decl. ¶ 6).  The Defendant contends that the monitor was connected for several reasons.  (McKee Decl. ¶ 6).  One reason was because of the recently discovered problems with print shop employees improperly checking in and out for work and lunch breaks.  (McKee Decl. ¶ 6).  One camera showed a view of the time clock and McKee was able to check employees as they clocked in and out.  (McKee Decl. ¶ 6). Another reason McKee monitored the monitors was to observe the six color press.  (McKee Decl. ¶ 6).  As noted above, the six-color press was extremely expensive and a highly sensitive press and needed to be able to be observed at any time.  (McKee Decl. ¶ 6).  In addition, around this time the amount of business being handled by the print shop and distribution center was increasing, leading to an increase in the number of outside truckers coming in and out of the distribution center.  (McKee Decl. ¶ 6).  McKee was concerned, for security reasons, with observing the areas of the distribution center where the outside truckers would enter and exit the building.  (McKee Decl. ¶ 6).  The Defendant contends that none of these cameras have ever been located to monitor a particular employee or group of

employees.  (McKee Decl. ¶ 6).  The Plaintiff has not provided any evidence to establish that the cameras were arranged and monitored to discriminate against the Plaintiff on account of his race.

6.    **Stopping Up a Commode**

The Plaintiff asserts that he was singled out and accused of stopping up a commode at work, creating a racially hostile work environment.  The Defendant has provided evidence that McKee thought Plaintiff had stopped up a commode based on a prior incident and not on account of his race.   Plaintiff admits that the reason McKee thought he might be responsible was because, on at least one prior occasion, he had in fact stopped up the commode.  (Thomas Dep., p. 220-222).  When Plaintiff was questioned by Kirkland about whether he had stopped up the commode again and he denied such act, Kirkland did not further pursue the matter with the Plaintiff.  (Thomas Dep., p. 224).  However, McKee called a meeting with all employees and made it clear that no one should stop up the commode and that if it got stopped up, the employee should not walk off and leave it.  (Thomas Dep., 224-225).  The Court finds that the Plaintiff has not provided any evidence to establish that he was accused of stopping up a commode or singled out on account of his race.

7.    **Plaintiff was not Spoken to by his Supervisor**

The Plaintiff alleges that McKee, his supervisor, was not friendly and did not speak to him and the other black employees; however, Plaintiff alleges that McKee was very friendly and talkative with the white employees.   The Defendant contends that a determination that an unfriendly supervisor creates a hostile work environment would turn Title VII into a "general civility code," against which the United States Supreme Court has warned.  Further, the Defendant has provided some uncontroverted evidence that he spoke

26

to Plaintiff on several occasions and tried to convince Plaintiff not to resign when Plaintiff gave him his two-weeks notice.  Title VII jurisprudence does prohibit using Title VII to police "ordinary socializing in the workplace" as discriminatory conditions of employment. Oncale v. Sundower Offshore Services, Inc., 523 U.S. 75, 81 (1998).  Therefore, courts are required to consider whether the alleged discriminatory act is severe or pervasive enough to create an objectively hostile or abusive work environment.  The Court is required to consider frequent or severe discriminatory conduct, physically threatening, or humiliating conduct, or any discriminatory conduct that unreasonably interfered with Plaintiff's job performance. Plaintiff acknowledges that McKee's alleged unfriendliness did not interfere with Plaintiff's job performance.  Plaintiff has not provided evidence that McKee's alleged unfriendly conduct was frequent, severe, physically threatening or humiliating.  The Court finds that Plaintiff has not provided sufficient evidence to establish that McKee's alleged unfriendly conduct was based on race or was severe or pervasive enough to create an objectively hostile or abusive work environment.

8.   **Passed Over for Promotions**

          Plaintiff alleges that he was passed over for promotions.  The Defendant has provided evidence that Plaintiff was promoted twice as a bindery helper and as a press helper.  The one vacant position that Plaintiff challenges is the press helper position that was given to Williams.   Plaintiff has voluntarily abandoned his claim that he was passed over for a promotion at HealthSouth because of his race.  The Court finds that Plaintiff has not provided evidence to establish that he was passed over for promotions creating a racially hostile work environment.

9.   **Inadequate Pay**

Plaintiff alleges that he commenced working in the press helper job in August, 2000, without receiving the proper pay for the job.  The Defendant has provided evidence that Plaintiff began working in the press helper position on a "trial basis" in approximately August, 2000, and was formally promoted to the press helper position in December 2000. (Thomas Dep., p. 94, 102-104).  When Thomas was formally placed in the press helper position, he received a raise retroactive back to the time when he started working in that job. (Thomas Dep., p. 94, 102-104).  The Court finds that the Plaintiff has not provided evidence to establish that he did not receive proper pay for the press helper position resulting in a racially hostile work environment.

10.     **Supervisors' Discouraging Words Regarding Press Helper Promotion**

          The Plaintiff alleges that his supervisors tried to talk him out of taking the press helper position.  The Defendant has provided evidence that the Defendant offered Plaintiff a promotion into the press helper position.  In addition, the supervisors, on behalf of the Defendant, informed Plaintiff that the press helper position had increased responsibilities and he had to be on this job at all times when the machine was running.  (Thomas Dep., p. 180-181).  The Plaintiff interpreted the advice of the supervisors as an attempt to discourage him from taking the position.  The Court finds that the Plaintiff has not provided sufficient evidence that the supervisors' advice was an attempt to discourage the Plaintiff from taking the press helper promotion on account of his race.

          Even assuming, however, that after taking all of Plaintiff's allegations into consideration, the Court determines that the Plaintiff was subjected to harassment based on his race, Plaintiff has failed to establish that he suffered a racially hostile work environment sufficiently severe or pervasive to alter the terms or conditions of his employment.  Upon

28

review of the record, the Plaintiff does not assert any allegations of frequent or severe discriminatory conduct, physically threatening or humiliating conduct, or any discriminatory conduct that unreasonably interfered with Plaintiff's job performance.

Accordingly, the Court finds that the Plaintiff has presented insufficient evidence to establish a racially hostile environment claim. Therefore, the Defendant's motion for summary judgment is granted as to this claim.

## D.  Constructive Discharge

A constructive discharge in violation of Title VII occurs when an employee is compelled to resign because the employer is deliberately subjecting him to exceedingly intolerable and illegal working conditions which are a direct result of the employee's race, color, religion, sex, or national origin. Jones v. Winn-Dixie Stores, Inc., 75 F.Supp.2d 1357 (S.D. Fla. 1999). To prove a case of constructive discharge, an employee must demonstrate that his working environment was so intolerable that a reasonable person in his position would be compelled to resign. Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996).

The Plaintiff asserts that the environment at HealthSouth was brutal, resulting in him being constructively discharged, because: (1)  Plaintiff was not allowed to touch certain buttons on a machine important to his job; (2) Plaintiff was forced to pick up additional duties during slow periods although white employees were allowed to stand around; (3) Plaintiff was told not to talk with a consultant on a machine on which he worked; (4) Plaintiff was threatened by McKee after he complained of race discrimination; (5) Plaintiff was specifically watched on cameras by McKee; (6) Plaintiff was accused of stopping up a commode; (7) Plaintiff was not spoken to by his supervisor

McKee; (8) Plaintiff was passed over for promotions; (9) Plaintiff worked in a job without receiving the proper pay; and (10) Plaintiff had to endure his supervisors' attempts to talk him out of a job he wanted.  The Defendant argues that the Plaintiff cannot establish a constructive discharge claim as a matter of law as the undisputed evidence establishes that he did not resign from his employment at HealthSouth until after he had secured another position.  As such, he cannot establish that he was subjected to conditions so intolerable that he had no option but to resign.

It is undisputed evidence that the Plaintiff did not resign from his employment at HealthSouth until he had waited approximately eight months to secure a higher paying position at another shop.  The Plaintiff argues that the Defendant's assertion that Plaintiff cannot claim constructive discharge because he had another job lined up at the time he quit is without merit and overlooks the fact that people endure many things that they and a reasonable person would consider intolerable in order to provide for a family.  The Defendant provided as persuasive authority the decisions from other courts that have considered the fact that a plaintiff searched for alternative employment while remaining on a job that allegedly subjected the plaintiff to an intolerable environment as an indicator that the plaintiff was less likely subjected to working conditions that a reasonable person would  consider intolerable and therefore was compelled to resign.  Wagner v. Sanders Assoc., Inc., 638 F.Supp. 742 (C.D. Cal. 1986); Regis v. Metropolitan Jewish Geriatric Center, 2000 U.S. Dist. LEXIS 2215 (E.D.N.Y. 2000).  In reviewing the case law, federal courts in the Fifth Circuit have also considered such fact for determining whether a Plaintiff was subjected to a constructive discharge.  See Davis v. Brown & Root Industrial Services, 889 F.Supp. 920 (W.D.La. 1995).  In deposition testimony, the

Plaintiff acknowledges that he was not going to leave HealthSouth until he had a job at Birmingham Printing.  (Thomas Dep., p. 82-83).  The Plaintiff persistently pursued an employment opportunity at Birmingham Printing for several months before resigning from HealthSouth.

Further, the Plaintiff does not provide sufficient evidence to establish a level of severity or pervasiveness to support his constructive discharge claim.  The Eleventh Circuit has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of "intolerable."  Wardell v. School Bd. of Palm Beach County, Florida , 786 F.2d 1554,1558 (11th Cir. 1986).   In establishing intolerable working conditions, the plaintiff must demonstrate the severity or pervasiveness of the harassment.  The standard for proving constructive discharge is higher than the standard for proving a hostile work environment claim.  Hipp v. Liberty Nat'l. Life Ins. Co., 252 F.3d 1208 (11th Cir. 2001).   The Plaintiff has presented no evidence to show that the alleged factors which led to a brutal environment were severe and pervasive or resulted in a deterioration of his working conditions which compelled him to resign.  Further, the Plaintiff has not presented evidence to demonstrate that he was compelled to resign because the employer deliberately subjected him to exceedingly and intolerable illegal employment actions which were a direct result of his race.  Thus, viewing the totality of the circumstances surrounding Plaintiff's resignation, this Court finds that Plaintiff has not provided enough evidence to support a constructive discharge claim.

### E.  Retaliation Claim

The Plaintiff alleges in his complaint that he attempted to use the Defendant's internal complaint procedures to express his concerns regarding discrimination and

retaliation; however, no corrective action was taken by the Defendant and further Plaintiff was subjected to retaliation.  The Plaintiff alleges that he was retaliated against by the Defendant when: (1) the Defendant placed a camera in McKee's office to monitor him and other black employees; (2) he was forced to pick up additional duties during slow periods although white employees were allowed to stand around; (3) he was not allowed to touch certain buttons on the Heidelberg machine on which he worked; and (4) he suffered a constructive discharge.  The Defendant asserts that: (1) Plaintiff fails to allege that he suffered an adverse employment action causally connected to any protected activity; (2) three of the four allegations do not constitute adverse employment actions as a matter of law; and (3) even if the three allegations are considered adverse employment actions, each alleged action occurred prior to his participation in any alleged protected activity and not after.

Generally, to establish a prima facie case of retaliation a plaintiff must show:  (1) that he engaged in protected activity; (2) that his employer was aware of that activity; (3) that he suffered an adverse employment action; and (4) there was a causal link between his protected activity and the adverse employment action.  Maniccia v. Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103 F.3d 956, 959 (11th Cir. 1997)).  The causal link requirement is to be construed broadly, and the Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  Id. at 1460, quoting EEOC v. Reichhold Chem., Inc., 988 F.2d 1564, 1571-72 (11th Cir. 1993).  The allocation of the evidentiary burdens will be determined by whether the evidence for establishing the retaliation claim is characterized as "direct" or "circumstantial" evidence.

The protected activity in which Plaintiff engaged was reporting allegations to Ealy

32

in May, 2001, and filing a charge of discrimination with the EEOC in June, 2001.  Plaintiff alleges that "after he made his complaints known he was told by McKee that he was not allowed to touch certain buttons on the Heidelberg machine, even though he was a helper on the machine." (Plaintiff's brief p. 3).  The evidence establishes through Plaintiff's deposition testimony that during the entire time he worked as a press helper, he was not allowed to operate certain buttons on the press.  (Thomas Dep., p. 202).  Plaintiff commenced working as a press helper in August, 2000, and he made internal complaints to Ealy in May, 2001. Hence, he was forbidden to operate certain buttons on the press before making complaints to Ealy.  In addition, Plaintiff contends that he was forced to perform additional tasks when work was slow, while white employees were allowed to do nothing.  (Thomas Dep., p. 201). The evidence also establishes that Plaintiff was required to perform additional tasks during the entire time he worked as a press helper and not after he made an internal complaint. (Thomas Dep., p. 202).

Plaintiff further contends that security cameras were installed and pointed specifically in the areas where the black employees worked, allowing McKee to only monitor them, resulting in retaliation based on race.  (Thomas Dep., p. 232).  The Defendant contends that the cameras were positioned so that security could observe the entire production floor of the print shop and the areas of the distribution center where outside truckers would enter the building.  (McKee Decl. ¶ 5).  In addition, the Defendant alleges that a camera was pointed at the catwalk over the six color press to monitor any unauthorized personnel in that area. (McKee Decl. ¶ 5).   After May, 2001, McKee had a monitor placed in his office that was connected to the original security cameras.  (McKee Decl. ¶ 6).  This monitor shows the same camera views that are shown in the security office.  (McKee Decl. ¶ 6).  The Defendant

33

has provided evidence that the cameras were installed since 1999 in the facility that house the print shop and the distribution center.  A monitor was placed in McKee's office after May, 2001.  Hence, the cameras were installed and a monitor was placed in McKee's office prior to Plaintiff making an internal complaint to Ealy in May, 2001.  Therefore, the Court finds that the Plaintiff's allegations that he was retaliated against by the Defendant when: 1) the Defendant placed a camera in McKee's office to monitor him and other black employees; (2) he was forced to pick up additional duties during slow periods although white employees were allowed to stand around; and (3) he was not allowed to touch certain buttons on the Heidelberg machine on which he worked do not support his retaliation claim because these actions occurred prior to the Plaintiff engaging in a protected activity.

The only adverse action that Plaintiff alleges he suffered is a constructive discharge. As noted above, the Plaintiff has not provided sufficient evidence to establish that he suffered a constructive discharge by being subjected to working conditions that were so intolerable that he was compelled to resign.  Based on the foregoing reasons, the Court finds that Plaintiff has not established a prima facie case of retaliation.

### V. Conclusion

For the reasons set forth above, the Court grants the Defendant's motion for summary judgment as to Plaintiff's discrimination and retaliation claims.

**DONE** and **ORDERED** this 25th day of March, 2005.

_____

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**